**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07 C 3155 |
| | ) | |
| v. | ) | |
| | ) | |
| IFC CREDIT CORPORATION, | ) | <u>Magistrate Judge Cole</u> |
| | ) | |
| Defendant. | ) | |

**FTC'S MOTION FOR SUMMARY JUDGMENT**

**AND SUPPORTING MEMORANDUM OF LAW**

# TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.    LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.      Standard for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.      Unfair Acts or Practices under the FTC Act . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        C.      Deceptive Acts or Practices under the FTC Act . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.     NO GENUINE ISSUE OF MATERIAL FACT PRECLUDES SUMMARY JUDGMENT

        FOR THE FTC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      IFC's Unfair Collections Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                1.      IFC's Practices Cause Substantial Injury . . . . . . . . . . . . . . . . . . . . . . . . 7

                2.      Consumers Cannot Reasonably Avoid the Injury . . . . . . . . . . . . . . . . . . 8

                3.      Injury Not Outweighed by Countervailing Benefits . . . . . . . . . . . . . . . 14

        B.      Filing in Distant Forum Unfair . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

                1.      Filing Suits in Distant Forums Causes Substantial Injury . . . . . . . . . . 27

                2.      Injury Caused by Distant Forum Filings Not Avoidable . . . . . . . . . . . . 28

                3.      Harm to Consumers Not Outweighed by Benefits to Competition under

                        the Circumstances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

                4.      Distant Forum Collections Legally Unfair . . . . . . . . . . . . . . . . . . . . . . . 28

        C.      IFC's Deceptive Claims Violate Section 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        D.      This Court Has the Authority to Impose the Requested Relief . . . . . . . . . . . . . 32

                1.      Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

                2.      Restitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

                3.      Reporting Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

V.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## I.  INTRODUCTION

The Federal Trade Commission ("FTC" or "Commission") hereby moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Mindful of the Court's admonition to carefully assess whether there are genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law prior to filing a motion for summary judgment, the FTC argues that the operative facts of this case are not in controversy, even if the legal meaning to be ascribed to those facts remains hotly contested.  Even a grant of partial summary judgment would limit the issues for trial and focus the parties on the clear disputes.

The FTC alleges that defendant IFC Credit Corp. ("IFC")  purchased and collected on NorVergence equipment rental agreements with knowledge that the rental agreements misstated the consideration and were procured by deceiving consumers, typically relatively unsophisticated small businesses and nonprofits.  This caused substantial injury to consumers, which was not reasonably avoidable by the consumers themselves, and is not outweighed by countervailing benefits to consumers or competition; thus the practice is unfair in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and (n).  The FTC also alleges as unfair IFC's practice of suing consumers on these rental agreements in distant forums.  Finally, the FTC alleges that IFC falsely represented to consumers that they had no legal defenses to IFC's enforcement effort, and that consumers were obligated to pay because they engaged in fraud or misrepresentation when they signed a form accepting delivery of the equipment.  IFC's misrepresentations are deceptive and violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).  The FTC's complaint was brought pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), which authorizes the Court to impose permanent injunctive and other equitable relief to remedy violations of Section 5 of the FTC Act.

## II.  BACKGROUND

IFC purchased almost 800 equipment rental agreements from now-defunct telecommunications services provider NorVergence between November 2003 and June 2004, when NorVergence was forced into bankruptcy.  [SJ Facts 4, 6]  As Judge Easterbrook has described,

> NorVergence sold telecommunications equipment and services – or claimed to do so.  After three apparently flourishing years it collapsed.  The supposedly wondrous equipment it sold or rented, which it called a Merged Access Transport

Intelligent Xchange (MATRIX) device, turned out to be a standard integrated-access box with none of the benefits that NorVergence had touted.

*IFC Credit Corp. v. United Bus. & Indust'l Fed. Credit Union,* 512 F.3d 989 (7th Cir. 2008). The NorVergence equipment rental agreements were signed by consumers who thought they were applying to purchase a combined package of telecommunications services and equipment. [SJ Facts 9, 14] NorVergence promised consumers that the combined package would deliver savings of 20% to 60% on their monthly telecommunications bills, guaranteed for five years. [SJ Fact 8] Part of the "savings solution" NorVergence pitched was the "Matrix" box that hooked the consumer's existing phone lines into a T-1 line, purportedly providing unlimited telephone and internet services for a guaranteed flat rate. [SJ Fact 10] Consumers were told that the Matrix box was "carrier neutral" and that they would receive the promised savings on their telecommunications services even if NorVergence went out of business. [SJ Fact 11] These representations were false. The Matrix boxes worked only through NorVergence, and when NorVergence stopped providing services in July 2004, the boxes were worthless to consumers. [SJ Facts 7, 48]

NorVergence produced a "savings analysis" for each consumer based on the consumer's past phone bills and current telecommunications needs. [SJ Fact 12] The savings analysis showed a bottom line monthly payment that was substantially less than the consumer's current payment and sometimes included additional services like cell phones or Internet connectivity. [SJ Fact 12] Consumers had to apply for the promised telecommunications savings package by signing multiple, confusing documents, including a services application, a hardware application, the equipment rental agreement, a credit application, and other documents. [SJ Facts 15-18] NorVergence salespeople assured consumers that signing these documents was just a first step in the application process, and that nothing was binding. [SJ Fact 22]

Buried in this set of non-binding documents was the equipment rental agreement for the Matrix box. [SJ Facts 15, 18] Unlike the other documents in the consumers' application packages, and again contrary to the salespersons' representations and the consumers' understanding of the transaction, the rental agreement purported to be binding and unrelated to the other agreements the consumers were signing. [SJ Fact 19] The rental agreement presented to consumers for their signature did not describe the specific equipment to be provided to the

consumer, stating in the "equipment description" box of the form only the word "Matrix" (omitting any mention of network cards, phones, or other equipment). [SJ Fact 20] On the back page, in fine print, were a non-cancellability clause and various waivers of defenses. [SJ Fact 18] The rental agreement stated that the only consideration for consumers' payments was the equipment, even though the cost of the rental far exceeded the value of the equipment and the extra amount was obviously intended to cover the costs of the services promised to consumers.[1] [SJ Facts 18, 45, 46] Consumers had relied on the promise of discounted telecommunications services in agreeing to the deal. [SJ Fact 14] Also included in the rental agreement form was a personal guarantee that made the individual signing the document personally liable for payment in the event of default. [SJ Fact 18] More than 70% of the rental agreements purchased by IFC included this personal guarantee. [SJ Fact 93]

When NorVergence delivered the Matrix box – long before it was to be connected to any phone lines – consumers signed a "Delivery and Acceptance" form provided to them by the NorVergence delivery person. [SJ Fact 40] Consumers believed they were signing a receipt accepting delivery of the goods, just as they routinely sign receipts for FedEx, UPS, or other delivered items. [SJ Fact 41] The delivery form, however, included the statement, "The Equipment conforms with our requirements." [SJ Fact 40] Of course, at this time the Matrix box was not connected, and no services had been received. [SJ Fact 39] It was not possible for any consumer to know that the equipment conformed with anything. [SJ Fact 42]

Shortly after consumers took delivery of the Matrix box, an IFC verifier called them to make sure that they had received the equipment. [SJ Fact 77] IFC, which used the verification script provided by NorVergence, rather than its standard script, did not ask if the Matrix box was connected to the consumer's phone system, or otherwise providing services, but only asked if the box was "mounted," meaning that it was screwed to the wall. [SJ Facts 77, 78] During this call, the IFC verifier expressly stated that the consumer's monthly payments would produce the five years of savings promised by NorVergence. [SJ Fact 77]

---

[1] The rental agreement amount ranged from 5 to 92 times the actual cost to NorVergence of the equipment rented. [SJ Fact 45]

*FTC's Motion and Memo in Support of Summary Judgment – Page 3*

Ultimately, consumers did not receive the telecommunications services for which they had bargained. [SJ Facts 6, 47] Despite this failure of consideration, IFC has already collected more than $4 million on the rental agreements and is currently collecting additional amounts. [SJ Fact 94]

IFC bought the equipment rental agreements from NorVergence knowing that the agreements described the consideration for the agreement as the Matrix box alone, even though the agreements charged the consumers amounts far greater than the cost of the equipment itself, and knowing that consumers were expecting to receive discounted telecommunications services for the agreed-to payments. [SJ Facts 53-62] This key deception about the rental agreements allowed IFC to try to collect on them even after the promised phone services stopped for good.

NorVergence was forced into bankruptcy in June 2004 and, for any NorVergence customers who ever had service, it was turned off before August 1, 2004. [SJ Fact 6] IFC continues to collect on the rental agreements it purchased, forcing consumers to pay for a worthless piece of equipment while they receive none of the contracted services. [SJ Fact 94] Consumers who refuse to pay for services they are not receiving have been sued by IFC, often in a distant forum, causing these consumers either to incur additional expense to defend themselves or to suffer a default judgment. [SJ Facts 84, 85, 87] This is a particular hardship for the nonprofits and small businesses victimized by NorVergence, and for the individual consumers who signed personal guarantees for the rental agreements. [SJ Facts 93, 95]

## III. LEGAL STANDARDS

### A. Standard for Summary Judgment

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). Material facts are facts that "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not a disfavored procedural shortcut, but rather is "an integral part" of the judicial system. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The Court must view the facts and draw reasonable

inferences in the light most favorable to the party opposing the motion. *Iron Workers Tri-State Welfare Plan v. Carter Construction, Inc.,* 2008 U.S. Dist. LEXIS 3995 at *15-16 (N.D. Ill., Jan. 18, 2008) (*citing Scott v. Harris,* 550 U.S. –, 127 S. Ct. 1769, 1774-1775, 167 L. Ed. 2d 686 (2007)).

> **B.     Unfair Acts or Practices under the FTC Act**

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits unfair or deceptive acts or practices in or affecting commerce. An act or practice is "unfair" if it causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. 15 U.S.C. § 45(n); FTC Unfairness Statement (1980) (appended to *In re International Harvester Co.*, 104 F.T.C. 949, 1070 (1984), 1984 FTC LEXIS 2, *305) (hereafter "FTC Unfairness Statement").[2] The Commission has used its unfairness authority previously to assist classes of consumers injured by a company's systematic contract law violations. *See Orkin Exterminating Co. v. FTC,* 849 F.2d 1354 (11th Cir. 1988). The FTC can show substantial injury by, among other things, establishing that consumers were injured by a practice for which they did not bargain. *Orkin,* 849 F.2d at 1364-65. Injury is sufficiently substantial if it causes a small harm to a large class of people, *FTC v. Windward Mktg, Ltd.,* No. 1:96-CV-615-FMH, 1997 U.S. Dist. LEXIS 17114 at *31-32 (N.D. Ga. Sept. 30, 1997), or a severe harm to a limited number of people, *International Harvester*, 104 F.T.C. at 1064. The second prong of the unfairness test focuses on whether the consumers had a free and informed choice that would have enabled them to avoid the unfair practice. *FTC v. J.K. Publications, Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000). Finally, the third prong of the unfairness standard measures the adverse consequences of the practice to consumers against any benefits to consumers or competition. *Windward Mktg.,* 1997 U.S. Dist. LEXIS 17114 at *32 (*citing Orkin,* 849 F.2d at 1365). *See also American Fin. Servs. Ass'n. v. FTC*, 767 F.2d 957, 975 (D.C. Cir. 1985).

---

[2] Defendants have argued elsewhere that the businesses and nonprofits victimized by NorVergence and IFC are not protected by the FTC Act. This is not the case; the FTC Act is not limited in its application to transactions involving the sale of consumer goods and services. The Commission has fully briefed this issue in response to IFC's Motion to Dismiss, filed on July 25, 2007. [Docket # 47]

Additionally, the unfairness standard, focusing as it does upon consumer injury, does not require the court to take into account the mental state of the party accused of a Section 5 violation. "The purpose of the Federal Trade Commission Act is to protect the public, not punish the wrongdoer." *Regina Corp. v. FTC*, 322 F.2d 765, 768 (3d Cir. 1963). Consequently, the "Commission has traditionally focused on the effects of conduct in order to afford the most protection possible for the public." *In re International Harvester*, 104 F.T.C. at 1085. A practice may be found unfair to consumers without a showing that the offending party intended to cause consumer injury. *Orkin*, 849 F.2d at 1368.

### C.      Deceptive Acts or Practices under the FTC Act[3]

An act or practice is "deceptive" under Section 5 if there is a representation, omission, or practice that is likely to mislead consumers acting reasonably under the circumstances and if that representation, omission, or practice is material to the consumer's payment decision. *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634-35 (7th Cir. 2005)*; FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988). Reasonable consumers are not required to doubt the veracity of express representations, and the Court may presume express claims to be material. *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994). Consumers' reliance on express claims is presumptively reasonable. *FTC v. World Media Brokers, Inc.*, No. 02 C 6985, 2004 U.S. District LEXIS 3227, at *24-25 (N.D. Ill. March 2, 2004). Implied claims are presumptively material where there is evidence that the seller intended to make the claims, *Kraft*, 970 F.2d at 322, or the claims go to the heart of the solicitation or the characteristics of the product or service offered. *In re Southwest Sunsites, Inc.*, 105 F.T.C. 7, 149, 1980 FTC LEXIS 86, *328 (1985), *aff'd*, 785 F.2d 1431 (9th Cir. 1986).

---

[3] The D.C. Circuit has distinguished the rationales supporting deception and unfairness: "A practice is deceptive when the consumer is forced to bear a larger risk than expected (e.g., the consumer is misled) whereas a practice is unfair when the consumer is forced to bear a larger risk than an efficient market would require." *American Fin. Servs. Ass'n.,* 767 F.2d at 980. This case involves an interplay between these two legal constructs.

IV.     **NO GENUINE ISSUE OF MATERIAL FACT PRECLUDES SUMMARY JUDGMENT FOR THE FTC**

   A.     **IFC's Unfair Collections Practices**

The heart of the FTC's case rests on Count II of the complaint, which alleges that IFC's practices in accepting and collecting on the NorVergence equipment rental agreements cause or are likely to cause substantial injury that is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or competition, and are thus unfair. While the legal significance to be accorded the facts may be sharply contested, the facts establishing IFC's unfair practices and their injurious effects are undisputed.

   1.     **IFC's Practices Cause Substantial Injury**

IFC's practice of accepting and then aggressively collecting on rental agreements procured through deception substantially injures consumers. Consumers are either paying IFC for services they will never receive, or spending time and money litigating against IFC. [SJ Facts 6, 84-86, 94, 95] Such economic harm constitutes substantial injury for purposes of FTC unfairness law. *See, e.g., Windward Mktg.,* 1997 U.S. Dist. LEXIS 17114 at *9, *37-38 (unauthorized debit of $297.96 from consumer's bank account constituted substantial injury). The economic harm here is not trivial. Because of an acceleration clause in the rental agreement, IFC sues defaulting consumers for the total payments due over the life of the 60-month agreement, for sums ranging from $10,000 to $160,000. [SJ Facts 18, 57]

Few businesses can readily afford to pay an expense as great as the accelerated amount IFC seeks to collect on the rental agreements while getting nothing in return. For the religious organizations and other nonprofits who were victims of NorVergence's deception, the financial consequences of paying IFC for nothing are especially harmful. Every dollar sent to IFC represents a dollar not available to spend on program services like sending disadvantaged girls to camp, providing food, shelter and clothing for elderly homeless people, or supporting children's and youth ministries. [SJ Fact 95]

Consumers who personally guaranteed the rental agreements and the small businesses they own also suffer from paying thousands of dollars for services never provided. [SJ Facts 93, 95] For example, like most of the business owners victimized by IFC, Randall Spicher, owner of a start-up sign-making company in Sugar Land, Texas, provided a personal guarantee for the rental agreement. [SJ Facts 93, 95] His company never received services promised by

NorVergence, but has since been sued by IFC for $16,907.69. He feared that a judgment against him by IFC would devastate the business in which he invested most of his life savings and probably wipe out the balance of his retirement funds. [SJ Fact 95]

### 2. Consumers Cannot Reasonably Avoid the Injury

Consumers cannot reasonably avoid the substantial injury caused by IFC's practice of collecting on rental agreements procured by deception. At the most immediate level, consumers cannot avoid IFC's collection efforts and the resulting economic harm. They can pay IFC, pay a default judgment incurred by ignoring IFC, or pay an attorney to defend against an IFC lawsuit, but pay they do. [SJ Facts 84, 85, 87] When they pay, they are paying for a now-worthless piece of equipment best described by an IFC official as "an overpriced bookend." [SJ Fact 49]

Consumers also could not reasonably have avoided the underlying deception that led them to sign the equipment rental agreement and the delivery and acceptance certificate. Deceptive practices like those engaged in by NorVergence prevent consumers from making fully informed decisions. Such practices were explicitly contemplated by the Commission in formulating its unfairness policy statement. As the Commission explained:

> Normally we expect the marketplace to be self-correcting, and we rely on consumer choice – the ability of individual consumers to make their own private purchasing decisions without regulatory intervention – to govern the market. We anticipate that consumers will survey the available alternatives, choose those that are most desirable, and avoid those that are inadequate or unsatisfactory. However, it has long been recognized that certain types of sales techniques may prevent consumers from effectively making their own decisions, and that corrective action may then become necessary. Most of the Commission's unfairness matters are brought under these circumstances. They are brought, not to second-guess the wisdom of particular consumer decisions, but rather to halt some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking.

FTC Unfairness Statement, 104 F.T.C. at 1070, 1984 FTC LEXIS 2 at *310.

### *"Equipment Rental and Service Goes Hand-in-Hand"*

Here the sales practices of NorVergence prevented consumers from making fully informed decisions. Consumers had no reason to expect – or suspect – that the documents they signed would not reflect the deal as it was described to them. That deal was for phone services, not equipment rental. [SJ Facts 14, 35] The entire sales pitch focused on a single package of

phone and Internet services plus equipment that together provided the promised savings. As one Novergence brochure touted: "Our one-stop solution addresses all of your telecommunications needs and bundles them into an easily managed package that keeps your company on the leading edge of technology." [SJ Fact 9] Neither the equipment nor the services could be ordered separately from the other. [SJ Fact 9] As one salesperson explained:

> The equipment rental and service goes hand-in-hand. They are not separate. Otherwise it is – it's misleading the customer to make them think that a company would have them lease equipment for no reason. That – that just – that would be bad practice. So nobody in their right mind would accept something like that. [SJ Fact 9]

Understanding the transaction to be for phone services, consumers assessed the financial risk differently than they would a purchase of equipment, reasonably believing that, like any other purchase of services, if the company stopped providing the services, they would no longer have to pay. [SJ Facts 14, 33, 35] This was a reasonable assumption – neither top IFC officials experienced in the leasing business and knowledgeable about the rental agreement's terms nor NorVergence salespeople believed that consumers would have to pay for five years of phone services they did not receive. [SJ Fact 34] Additionally, because the consumers believed themselves to be signing up for monthly phone service – not a transaction for which an attorney's advice is normally necessary – they typically did not have the documents reviewed by an attorney. [SJ Facts 14, 35, 36][4]

### "The Term Non-Binding Was a Big Part of Our Speech"

The NorVergence Training Manual and the testimony of NorVergence salespeople and consumers establish that the sales process itself was designed to mislead – and did in fact mislead – consumers about the significance of the documents they were signing. [SJ Facts 22-30] Consumers were told that they were signing a non-binding application for phone services

---

[4] While certainly creating steady employment for attorneys, the cost to small businesses and nonprofits of a policy that requires legal review of every purchase of services to avoid being tricked or deceived would seriously affect commerce as we know it. Consumer protection laws exist, at least in part, to require truthful dissemination of information about the purchase of goods and services so that consumers may make informed choices, and not be caught by a legal game of "gotcha." That is why the law rightly allows consumers in the market-place to rely on the express claims of sellers. *See, e.g., Kraft, Inc. v. FTC,* 970 F.2d at 322 (7th Cir. 1992) (reasonable consumers not required to doubt the veracity of express representations).

and that there was no obligation.  [SJ Facts 22, 23, 26, 27, 28, 30]  As one salesperson explained, "The term non-binding was – was something that we reiterated time and time again.  That was a big part of our speech."  [SJ Fact 24]  The signing process was described to consumers as necessary "to reserve the unlimited calling facilities with a nonbinding services and hardware application . . . .  Now these applications serve as a reservation only until, final approval is granted."  [SJ Fact 22]

Training materials specifically instructed salespeople not to describe the documents as a contract, but instead to refer to them as an application.  [SJ Fact 23]  According to the Training Manual, customers were told that even after signing all of the opening and closing paperwork there was no obligation.  [SJ Fact 27]  The "optional calm down" section of the closing script focused on the fact that the documents being signed were not binding, ending with the reminder, "Again, you are under no obligation until you are approved and receive final installation."  [SJ Fact 28]  Although described as "optional," NorVergence salespeople routinely used this "calm down" statement with consumers.  [SJ Fact 28]

"Non-Binding" was also a big part of the title of the "MATRIX T1 Non-Binding Hardware Application" and the "MATRIX T1 Non-Binding Services Application," two of the documents that consumers signed.  [SJ Facts 16, 17]  Reading beyond the title of the Non-Binding Hardware Application would still not have suggested to consumers that they were signing binding documents.  The Hardware Application described the equipment rental agreement as non-binding and reiterated in numerous places that "mutual consent" was necessary and that all parties must agree to move forward.  [SJ Fact 16]  The Non-Binding Services Application likewise reiterated that it was non-binding until "all parties agree to move forward" and "final consent of all parties to move forward."  [SJ Fact 17]

The equipment rental agreement was part of the package of application documents.  [SJ Facts 15, 18]  One salesperson described the rental agreement form as being "designed to be slid in without the customer really realizing what they are signing. . . .  So, the customer didn't fully understand it, they just thought that they were filling out an application."  [SJ Fact 25]  At the time the consumer signed, the copy of the equipment rental agreement did not specifically describe all the equipment that was being provided; the form typically just noted, in preprinted

type, "Matrix."  [SJ Facts 20, 21][5]  Sometime after the consumers signed the rental agreement NorVergence added in a complete description of the specific equipment covered by the agreement.  [SJ Fact 21]

Consumers corroborate these sales practices.  As consumer Alicia Wengert described, "She [the NorVergence salesperson] told me that none of these papers were binding until we had service and we were satisfied.  She said we were under absolutely no obligation, and she even showed me one paper that said neither party is under any obligation."  [SJ Fact 30]

### *"If You Snooze You Lose"*

NorVergence salespeople were also trained to create a sense of urgency in the application process.  [SJ Fact 31]  Salespeople were prohibited from returning to a business after the documents were signed, and told consumers that they must sign the application documents or lose the opportunity to take advantage of the promised deal.  [SJ Fact 31]  The Pricing and Savings Guarantee Certificate stated that savings proposals could "only be generated once," and "were not subject to change."  [SJ Fact 29]  The specifics of the deal were always non-negotiable.  [SJ Fact 13]

Consumer testimony confirms this:  "I was told that there was a limited amount of time, that they could not come out and offer this to me again, and that I could not apply again, and if I wanted to be considered for this program, because there was such tremendous desire to be in this program, that I had to sign right then and there.  They would not come out again."  [SJ Fact 32]  Consumer Stuart Perlitsh explained that he did not carefully read all the documents because there was not enough time.  "Pavel told me time was of the essence, basically.  If you snooze, you lose.  He had other businesses that he was soliciting and they did not have unlimited matrix boxes to dispense.  So we had to act quickly."  [SJ Fact 32]  Based on the representations that the consumers were signing a non-binding application, consumers reasonably believed, in most

---

[5]  This fact played a crucial role for the court in *IFC Credit Corp. v. Burton Industries, Inc.,* 2007 U.S. Dist. LEXIS 46580 (N.D. Ill., June 25, 2007) .  There, the court found that because the rental agreement signed by the consumer did not identify the equipment to be rented it was too indefinite to constitute a binding contract.  *Id.* at *8-9.

instances, that it was unnecessary to carefully read the fine-print in all the application documents.[6]  [SJ Facts 30, 32, 33, 36-38]

NorVergence salespeople were trained to overcome objections to signing the application documents.  [SJ Fact 26]  For consumers who questioned the five-year term, the FAQ script specifically reiterated that:

> The application is completely non-binding for both you and them serving as nothing more than a Good Faith reservation on your part, stating that while your company agrees to take a closer look it's willing to stand in line so that we can perform the due diligence required of us.  Only until final approval is granted and mutual consent given to move forward will they provide you with the matrix solution.  [SJ Fact 26]

Any concerns about the possibility of NorVergence going out of business were responded to with the explanation that the technology was "carrier neutral," and that savings were guaranteed to continue with or without NorVergence.  [SJ Fact 11]

### *Just Like FedEx*

Consumers also acted reasonably when they signed the delivery and acceptance certificate without careful scrutiny.  The form was presented to them by the person delivering the Matrix box to their premises, and they were asked to sign for the receipt of the equipment, just as they routinely sign for any other items delivered to them.  [SJ Facts 39, 40, 41]  At that time, the box was not connected to the consumer's phone system and no services were being provided.  [SJ Fact 39]  One consumer explained that he signed the delivery certificate as he normally signed for any other package: "Just as when we receive packages from UPS or Federal Express, they usually have a receipt for them or sign a receipt indicating that we've received the package.  The package could be an empty box, but they have us sign for receiving it."  [SJ Fact 41]

The text of the certificate included warranties that went beyond the typical delivery receipt, including the statement "The Equipment conforms with our requirements."  [SJ Fact 40]  Because the box was not yet connected to the consumers' phone systems, and they were not receiving any services, consumers had no reason to believe that their signature on the delivery

---

[6]  As noted above, even had the consumers read the documents, the repeated representations that the documents were not binding or final until "mutual consent" of all parties might well have caused them not to understand that they were, at that moment in time, signing a contract, noncompliance with which would lead to collections and a lawsuit by a finance company like IFC.  [SJ Facts 16, 17]

certificate suggested that they had evaluated the performance of the Matrix box, or that it was working as promised. [SJ Facts 39, 41] As consumer Perlitsh explained, "That was not what I was signing for. I understood this to be signing for the delivery of the product, but I certainly couldn't represent if the product delivered conformed with our requirements. That was not what I believed I was signing." [SJ Fact 42]

### No Free and Informed Choice

Consumers, who were not experts in either telecommunications technology or equipment leasing [SJ Facts 37, 38], were entitled to rely on the express claims of the NorVergence salespeople without being experts themselves. *World Travel*, 861 F.2d at 1029. They also could not reasonably have expected that NorVergence would fail to deliver the promised services, or that IFC would then try to collect from them for services they never received. [*See generally* SJ Fact 34, 35] The sentiments of consumer Perlitsh colloquially express this:

Q:    Did anybody from NorVergence ever tell you that you might have to pay on an equipment lease every month for five years whether you got any phone services or not?

A:    No. That was never communicated to me, and clearly I would never have signed a contract if I knew I was going to be on the hook for worthless merchandise. I might be crazy but I'm not stupid.

[SJ Fact 33]

The NorVergence misrepresentations prevented a "free and informed choice" about the risks and benefits of pursuing NorVergence's "savings solution" and signing the application documents. Under these circumstances, consumers could not reasonably have avoided the injury that was ultimately caused by their signing the equipment rental agreement. *See FTC v. J.K. Publications, Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000). *See also* FTC Unfairness Statement.[7]

---

[7] The argument that, under these circumstances, consumers could not reasonably have avoided the injury is not inconsistent with well-established law holding parties responsible for knowledge of contracts they sign. *See generally Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 882 (7th Cir. 2005). From the oral descriptions of the documents as "non-binding applications" to the language of many of the documents representing that the deal would not go forward until final approval of the parties, consumers could not reasonably have known that they were signing an immediately binding and enforceable contract that demanded careful scrutiny.

### 3. Injury Not Outweighed by Countervailing Benefits

The substantial injury to consumers caused by IFC's practices – purchasing and collecting on NorVergence rental agreements while knowing that the agreements misstated the consideration and were procured by deception – is not outweighed by any countervailing benefits to consumers or competition. In assessing IFC's conduct under the countervailing benefits prong, the fact that it knew, or reasonably should have known, that the contracts misstated the consideration and were procured by deception sets its conduct apart from legitimate leasing transactions. Allowing IFC to collect on the contracts it procured with such knowledge harms rather than benefits both consumers and competition because it transfers funds from victims of deception to a party that both knew of the deception and sought to profit from it.

### *IFC's Knowledge of the Deceptive Sales Practices*

Prior to purchasing any NorVergence rental agreements, IFC understood that NorVergence was selling a complete package of telecommunications services, not just renting equipment. [SJ Fact 53] NorVergence gave IFC consumer sales materials stating that NorVergence was "Drastically Reducing Technology Costs" through a "one-stop solution [that] addresses all of your telecommunications needs and bundles them into an easily managed package." [SJ Fact 53] A top IFC official explained that IFC understood that NorVergence provided customers with a series of telecommunications solutions including cell phones, long distance and local calling: "This was supposedly a total solution to the customer." [SJ Fact 53] IFC knew that the services and equipment were presented to consumers as part of a single program. [SJ Facts 54, 55] For the equipment to be of value, service must be provided through a T-1 phone line, and IFC knew that consumers expected to receive these services. [SJ Facts 43, 49, 55, 56, 74, 77, 81, 82]

IFC also knew, from the information NorVergence provided it, that much of what consumers were agreeing to pay under the rental agreements was intended as consideration for services and that only a third to half of the package was hardware while the rest was services, installation, and maintenance. [SJ Fact 54] Documents provided to IFC showed that rental agreements for a single piece of hardware could range in price from $10,000 to at least $160,000. [SJ Fact 57] IFC also reviewed NorVergence's financial statements, which showed, among other things, that its revenues were seven times the costs of goods sold. [SJ Fact 58]

Thus, the cost of the equipment was a small part of NorVergence's costs. Finally, the savings analysis document presented to consumers, a sample of which was provided to IFC, showed that nearly 80% of total consumer payments were allocated to the equipment rental agreement. [SJ Fact 59][8] From these documents, it appears that most of NorVergence's revenues came from the equipment rental agreements, while only a small portion of its costs went to purchasing the equipment. This could only make sense if the rental agreement payments were predominantly consideration for services. From these documents, IFC should have recognized that the cost of the box was not driving the cost of the rental agreement. [SJ Fact 61]

That services and equipment rental were understood to be a single package by consumers was confirmed by IFC's plan to use consumers' expectation of services to ensure it got paid. [SJ Facts 62, 63] NorVergence assured IFC that, if consumers did not pay IFC under the rental agreements, NorVergence would cut off their services. [SJ Fact 62] As IFC's VP for Credit, Steve Csar, observed: "The schpiel is that we are replacing other costs with a less expensive alternative . . . and if they don't pay we can turn off their phone and Internet service." [SJ Fact 62] This was so important to IFC that it negotiated an amendment to its agreement with NorVergence that required NorVergence to do just that. [SJ Fact 63] Despite this understanding between NorVergence and IFC about the consequences of defaults by consumers, the rental agreement did not provide for any such cut off of service. [*See* SJ Fact 18] This was one more way that IFC was on notice that the rental agreement did not stand on its own.

To the extent IFC asked NorVergence to explain apparent oddities with respect to pricing or consumers' understanding of the deal, the answers it received, taken together with the information it already had, did not add up. Moreover, IFC admits that, prior to acquiring rental agreements from NorVergence, it did not do any independent evaluation of the function and value of the Matrix equipment. [SJ Facts 64, 66, 67] This failure to investigate was, in the words of IFC's credit VP, "bad business." [SJ Fact 65] Further, the cost and effort to do so

---

[8]   The savings analysis document also showed that the amount NorVergence allocated to services was less than 15% of the consumer's current charges and the amount for long distance and Internet was only 6% of current charges for the same services. To IFC, this should have looked too good to be true, given that NorVergence was representing only 20-60% savings on services costs. To consumers it was far less clear that the amount allocated to the rental agreement was intended by NorVergence and IFC to be collected simply for rental of the Matrix equipment, and would be collected even if the consumers did not receive services. [SJ Facts 33, 60]

would have been negligible.  For example, IFC knew that Adtran manufactured the Matrix and it could easily have examined Adtran's website or called the company.  [SJ Facts 66, 67, 68]  A simple call to someone in the telecommunications business would also have revealed the truth about the equipment – that it cost a fraction of what consumers were being charged in the rental agreements, and did not do what NorVergence said it did.  [SJ Facts 66, 67]

IFC's knowledge that NorVergence was promising telecommunications services in exchange for payments on the equipment rental agreement is also demonstrated by the confirmation call (dubbed a "verbal audit") that IFC made to NorVergence consumers.  [SJ Facts 77-80]  The audit script confirmed the amount of the net monthly rental for the Matrix box and stated that flat monthly cost "is protected for a 60-month term, producing the NorVergence savings you were promised."  [SJ Fact 77]  IFC knew that the flat monthly cost could only produce the promised savings if NorVergence provided the promised services at the promised price.  [SJ Fact 82]

Once it started acquiring rental agreements, IFC received substantial additional information that consumers were signing the rental agreements only as part and parcel of a program that would provide them with telecommunications services and that rental agreement payments were predominantly for services.  [SJ Facts 69-76, 81, 82]  For example, one IFC credit analyst explained that when, early on, many of the rental agreements did not include personal guarantees, NorVergence told IFC that this was because consumers equated signing the rental agreement with ordering phone service and they were not used to providing such guarantees.  [SJ Fact 35]

Another fact pattern placed IFC on notice that the rental agreements were predominantly for services.  From the very beginning, IFC was aware of extreme price variations in the rental contracts.  [SJ Fact 69]  If the payments were really for equipment, contract amounts for the same piece of equipment would not vary widely.  Although IFC's John Estok has commented that prudence requires an explanation for such disparities [SJ Fact 70], when IFC asked NorVergence to explain, NorVergence answered that price disparities reflected differing numbers of network cards provided in connection with each Matrix box or differing numbers of boxes.  [SJ Fact 71]  IFC's own records, however, showed different prices for boxes with the same number of cards and higher prices for boxes with fewer cards.  [SJ Fact 72]  The only

credible explanation for these variations was that different contracts called for the provision of different services. Thus IFC knew or ignored clear evidence that the rental agreements misrepresented the consideration that consumers expected in exchange for their payments.

Contrary to IFC's standard practice, IFC did nothing to disclose to consumers that they were entering into transactions for which IFC intended to collect no matter what else happened. [SJ Fact 78] In fact, the script it used for its "verbal audit" call to consumers, made by IFC shortly after the equipment was delivered – but before it was connected and providing any services – avoided statements and questions that might have communicated this to consumers. [SJ Facts 77-79] IFC's standard verbal audit, however, used in all of its other leasing transactions, is designed to elicit information to ensure the consumer understands that the rental agreement will require payment to IFC no matter what. [SJ Fact 78] That standard script includes such questions as, "Are you aware that under this lease finance agreement . . . you must make payments regardless of any problems or dissatisfaction you are having with the equipment?" and "Are you confirming that you have no other agreements in place of any kind for this equipment other than this lease agreement that we are now commencing?" [SJ Fact 78] None of these statements is in the verbal audit IFC read to NorVergence consumers. [Compare SJ Fact 77 to 78][9] Instead, as discussed earlier, the script repeats the NorVergence misrepresentation that payment on the rental agreement will produce the promised five years of telecommunications services savings. [SJ Fact 77]

### The Worse it Got, the More They Bought

Further, even as IFC was purchasing more NorVergence contracts, it was experiencing unusually high rates of first-payment default and hearing many complaints from consumers who resisted paying IFC because NorVergence was failing to deliver services. [SJ Fact 74][10] In February 2004, such complaints and defaults were occurring on a "wholesale" scale. [SJ Fact

---

[9] Had IFC asked such questions, it is likely that consumers would have tried to cancel the deal. Consumers uniformly state that if they had known they were signing a contract for equipment only, that could not be cancelled even if services were not being provided, they would not have agreed to the deal. [SJ Fact 33]

[10] The early default rate was even higher than IFC first knew, because NorVergence was secretly giving some consumers the money to make their first payments. [SJ Fact 75] This tactic, discovered by IFC in February 2004 and described by one IFC official as a practice that is viewed as fraud in the industry, did not slow IFC's purchases of NorVergence rental agreements at all. [SJ Facts 5, 76]

74]  By March 2004, IFC's customer service manager described the complaint volume as "alarming."  [SJ Fact 74]  The complaints and default rates confirmed what IFC knew from the beginning, that consumers expected services, not just equipment, for their rental payments.  [SJ Fact 54, 55, 56]  Despite these clear indications of trouble, IFC continued to invest in NorVergence's deception.[11]  In fact, it bought more contracts in May 2004 than in any other single month.  [SJ Fact 5]

Under these circumstances, IFC knew that the rental agreements were procured through deception.  The agreement falsely described the consideration for the agreement as limited to the Matrix box when, in reality, it was only part of an overall set of documents signed by consumers who were applying for an integrated package of services and equipment together.  IFC was not free to ignore the numerous red flags suggesting that the rental agreements were fraudulent.  *See Rosenblum's World of Judaica, Inc., v. IFC Credit Corp.*, No. 04 CH 18187, slip op. at 9 (Cir. Ct. Cook County, County Dep't, Ch. Div., Dec. 28, 2005) (denying motion to dismiss; holding that IFC was not free of responsibility when warnings such as consumer complaints  were apparent) (attached for the Court's convenience at PSJX 47).

### Net Effects Show No Benefits to Consumers or Competition

The countervailing benefits prong of the unfairness standard weighs whether the net effects of a practice are positive or negative.  *American Fin. Servs. Ass'n.*, 767 F.2d at  975 (*citing* the FTC Unfairness Statement).  Here the injury to unwitting consumers far outweighs any potential benefits to competition from allowing IFC to profit from deceptive conduct.  In fact, allowing IFC to collect on these contracts would shield it from the risks it assumed when it purchased the equipment rental agreements knowing that consumers had been induced to sign them through deceptive omissions, misrepresentations, and outright lies.  As was the case in *Orkin*, 849 F.2d 1354, here IFC is attempting to unilaterally shift the costs of its bad business decision to consumers.  Allowing such conduct would encourage fraud and deception in the marketplace, giving wrongdoers like NorVergence the ability to finance fraud simply by selling contracts to investors who, blinded by greed, ignore the underlying deception.  Indeed, that happened here, where IFC's financing of the deceptive scheme allowed NorVergence to

---

[11]  IFC did renegotiate its contract with NorVergence to increase the hold back percentage it deducted from its payments to NorVergence.  [SJ Fact 63]

*FTC's Motion and Memo in Support of Summary Judgment – Page 18*

continue in business and deceive hundreds of additional consumers.[12]  Such sanctioning of deception at the expense of consumers is a harm to competition, not a benefit that offsets the consumer injury.

Weighing the respective costs and benefits of the challenged practice also requires looking at the various costs that a remedy would entail.  *American Fin. Servs. Ass'n,* 767 F.2d at 975.  As articulated by the Commission, "These include not only the costs to the parties . . ., but also the burdens on society in general in the form of increased paperwork, increased regulatory burdens on the flow of information, reduced incentives to innovation and capital formation, and similar matters."  FTC Unfairness Statement, 1984 FTC LEXIS 2 at *307.  *See also Int'l Harvester,* 1984 FTC LEXIS 2 at *258, n. 59 ("What is important however is that we retain an overall sense of the relationship between costs and benefits.  We would not want to impose compliance costs of millions of dollars in order to prevent a bruised elbow.").

Here, a finding that IFC's practices were unfair will not impose additional costs on the leasing industry.  No new standard of care or due diligence requirements would be created – knowingly investing in fraud and deception has never been an acceptable practice.  Rather, IFC need only have paid attention to and acted on information already in its possession.  The undisputed facts show that IFC's evaluation of the NorVergence program conducted before acquiring rental agreements provided IFC with ample notice that consumers were being deceived and would have defenses to paying on the agreements if NorVergence failed to provide the promised services.  [SJ Facts 50-73]  In the face of this information, IFC consciously chose not to spend the minimal time and effort required to determine that the value and function of the Matrix equipment was being misrepresented.  [SJ Facts 64-68]  IFC assessed the risk of NorVergence's failure and chose to take that risk because it wanted the opportunity for growth and solid returns that partnering with NorVergence promised.  [SJ Fact 51]  Eventually, NorVergence contracts accounted for half of IFC's volume of business.  [SJ Fact 52]  Legitimate

---

[12]  IFC's financial support of NorVergence's fraudulent conduct not only caused additional consumer injury, but also harmed competition generally by prolonging the unlevel playing field created by NorVergence's deception.  That false or misleading advertising has an anticompetitive effect, as that term is customarily used, has been long established.  *FTC v. California Dental Ass'n.,* 526 US 756, 771 n. 9 (1999), *citing FTC v. Algoma Lumber Co., 291 U.S. 67, 79-80, 78 L. Ed. 655, 54 S. Ct. 315 (1934)* (finding a false advertisement to be unfair competition).

practices in the finance industry will not be affected if this Court refuses to allow IFC to avoid the financial consequences of a risk consciously taken by shifting the consequences of its knowing choice to consumers already deceived by NorVergence. There are no countervailing benefits to allowing IFC to purchase and collect on contracts it knew to be procured through deception.

Contract law considerations highlight that the policy against third parties knowingly profiting from deception is not unique to unfairness claims under the FTC Act. Familiar contract law principles echo that policy choice, refusing to provide favorable status to third parties who take fraudulent contracts or who have knowledge of defenses. For example, holder in due course protections are not afforded to third parties holding contracts obtained by fraud in the factum or who take contracts in bad faith (i.e., with notice of defenses). *See, e.g.,* 810 Ill. Comp. Stat. 5/9-403(b). Thus, several courts have found that IFC cannot enforce its NorVergence contracts because the contracts are void. *See, e.g., IFC Credit Corp. v. Burton Indus., Inc.,* 2007 U.S. Dist. LEXIS 46580 at *10-12 (N.D. Ill., June 25, 2007) (entering summary judgment for defendants because the Court found that their contract with NorVergence was void and thus not enforceable by IFC); *Specialty Optical v. IFC Credit Corp.*, Cause No. 04-04187-C (Tex. Dallas County Ct. at Law No. 3 heard on Feb. 8, 2006) (June 5, 2006) (NorVergence contract found to be void and thus not enforceable by IFC) (attached for the court's convince as PSJX 52). *See also IFC Credit Corp. v. United Bus. & Indust'l Fed. Credit Union,* 512 F.3d at 994 (remanding for bench trial, but noting that the jury previously found fraud in the factum that voided the contract and prohibited IFC's action). Other courts have refused to dismiss counterclaims alleging fraud in the inducement because, if IFC took with knowledge of that defense, the contract is voidable. *See IFC Credit Corp. v. Aliano Bros,* 2007 U.S. Dist. LEXIS 3595 at *7 (N.D. Ill., Jan. 12, 2007) (after remand, denying IFC's motion to dismiss counterclaim because defendants had adequately pled fraud; finding that "The Agreement is voidable by Aliano Brothers as to IFC if IFC knew of NorVergence's alleged fraud at the time of the assignment."). *See also IFC v. United Bus. & Indust'l Fed. Credit Union,* 474 F. Supp. 2d 956 (N.D. Ill., January 31, 2006) (denying IFC's motion for summary judgment where genuine issue of fact

existed as to whether IFC took with notice of a defense; noting that the contract's "hell or high water" clause and waiver of defenses clause would also falter with a showing of notice).[13]

### No Countervailing Benefits to Collecting on Contracts That Are Invalid Under State Law

While the above discussion focuses on the lack of countervailing benefits relating to IFC's practice of accepting and collecting on contracts procured through deception, here, where the contracts are invalid under state law, IFC's practices serve no benefit whatsoever.[14]  Not only is the harm to consumers magnified by unjustified legal actions, but there is no benefit to the legitimate leasing industry or society as a whole in sanctioning collections on invalid contracts.

IFC has argued here[15] and in numerous collection actions that it is a holder in due course, entitled to collect on the NorVergence contracts free of any defenses that the consumers might have had against NorVergence.[16]  Illinois law defines a holder in due course  as one who

> took the instrument (i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in Section 3-306 [*810 ILCS 5/3-306*], and (vi) without notice that any party has a

---

[13]  IFC officials themselves reflected the commonsense understanding that it is simply unfair to enforce the rental agreements without installed service.  As Collections VP Lee Herndon told others, "The idea that we can enforce these contracts when service has not been fully installed is ludicrous. . . .  Just because the Matrix box has been fastened to the wall does not mean that our non-cancellable contracts are enforceable. . . ."  [SJ Fact 83; *see also* SJ Fact 34]

[14]  The FTC need not prove that state law prohibits IFC from enforcing individual NorVergence contracts in order for the Court to find IFC's practices unfair.  It is enough to prove that IFC knew that the contracts were procured through deception.  Here, however, IFC's collection practices are also unfair because the state law contracts it seeks to enforce are not valid.  Thus, a longer discussion of the state law issues is necessary.

[15]  Although IFC has never answered the complaint, it did provide the FTC with a letter notice of defenses, one of which included that IFC is a holder in due course.

[16]  As a threshold matter, the agreements are not enforceable under the provisions of Article 2A of the UCC because NorVergence selected and supplied the equipment.  *See, e.g.*, 810 Ill. Comp. Stat. 5/2A-103(g)(I) (LEXIS 2007)**.**

*FTC's Motion and Memo in Support of Summary Judgment – Page 21*

defense or claim in recoupment stated in Section 3-305(a) [*810 ILCS 5/3-305*].
810 ILCS 5/3-302.[17]

Where the holder took with notice of a defense, it did not do so in good faith and cannot assume holder in due course protections. *IFC v. United Bus. & Indust'l Fed. Credit Union,* 474 F. Supp. 2d at 960-61 (N.D. Ill. January 31, 2006) (denying IFC's motion for summary judgment where question of fact remained as to whether IFC took the assignment with notice of a defense, and was thus not entitled to assert holder in due course status).

The holder in due course rule is not intended to protect parties who ignore apparent warnings. Rather, it is intended to facilitate commercial transactions by eliminating complex investigations of the nature of the drafting of an instrument or the consideration for which the instrument was initially exchanged. *See Rosenblum's World of Judaica*, No. 04 CH 18187, slip op. at 13 (*citing Kedzie & 103rd Currency Exch., Inc. v. Hodge,* 156 Ill. 2d 112, 122 (1993)) (attached for the Court's convenience at PSJX 47). A less-than-complex investigation of the nature of the NorVergence agreements would have revealed to IFC the true circumstances surrounding the agreements.

### *Defenses Not Waived*

Because IFC had notice of consumer defenses, thus defeating holder in due course status, it cannot rely on the waiver of defenses clause.[18] Further, the leases are not unconditionally enforceable under the "hell or high water" clause. Such clauses are only enforceable in the absence of fraud and deceit. *Rosenblum's World of Judaica,* No. 04 CH 18187, slip op. at 12 (noting, while denying an IFC motion to dismiss, that a claim of fraud or deceit that makes the NorVergence Rental Agreements invalid would defeat the "hell or high water" clause) (attached for the Court's convenience at PSJX 47). *See also Colorado Interstate Corp. v. CIT Group/Equip. Fin., Inc*., 993 F.2d 743, 749 (10th Cir. 1993) ("In the absence of fraud or deceit, which is not claimed here, it is our view that under Texas law the parties should be held to their

---

[17] The Commission looks to relevant Illinois law here, because that is the choice of law advocated by IFC in its numerous contract enforcement actions. *See, e.g.*, *IFC v. United Bus. & Indust'l Fed. Credit Union,* 474 F. Supp. 2d at 959 (applying Illinois law).

[18] *See, e.g.*, 810 Ill. Comp. Stat. 5/9-403, Cmnt. 3 (LEXIS 2007) (principles applicable to holders in due course of negotiable instruments also apply to holders in due course of debt assignments).

agreement."). *Cf. Liberty Bank, F.S.B. v. Diamond Paint & Supply, Inc.,* 2006 WL 2691719, slip op. at 2 (Iowa Ct. App., Sept. 21, 2006) (summary judgment enforcing waiver of defense and hell or high water clauses in NorVergence agreements assumed by Liberty Bank; but noting that fraud and unconscionability challenges to the agreements were not raised at trial and thus not preserved on appeal).

### The Rental Agreements Are Voidable Because IFC Took with Notice That the Contracts Were Fraudulently Induced by NorVergence

Here, the undisputed facts show that NorVergence committed fraud when it induced consumers to sign the rental agreements. Under Illinois law, a claim for fraudulent inducement requires:

> (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induced plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement.

*IFC v. Aliano Bros. Gen'l Contractors, Inc.,* 2007 U.S. Dist. LEXIS 3595 at *7-8 (N.D. Ill., Jan. 12, 2007) (on remand, denying IFC motion to dismiss counterclaims of fraud). *See also Davis v. G.N. Mortgage Corp.,* 396 F.3d 869, 881-82 (7th Cir. 2005). NorVergence made numerous false statements of material fact, with knowledge of their falsity and with the intent of causing action. The misrepresentations included:

- that payment on the rental agreement and associated service agreements would result in the consumer receiving the promised discounted telecommunications services for a five year term [SJ Facts 8, 9, 12];

- that NorVergence would treat the applications, forms, and rental agreement that consumers were signing as a unified agreement under which NorVergence would provide telecommunications services in exchange for consumers' payments [SJ Facts 9, 22];

- that the Matrix box would create the promised substantial savings in the consumers' total cost of telecommunications services even if NorVergence went away [SJ Facts 10, 11]; and

- that the rental agreement was a non-binding application and that signing it posed no risk to consumers [SJ Facts 22-28, 30].

Through these misrepresentations, NorVergence caused consumers to sign the rental agreement, among other documents. [SJ Facts 14, 33, 35] Consumers who relied on these representations have not received the promised telecommunications savings, and have been sued by IFC. [SJ Facts 6, 47, 84][19]

IFC had notice of NorVergence's misrepresentations, but purchased the contracts anyway. [SJ Facts 50-83][20] Under these circumstances, it did so in bad faith, and cannot assume the mantle of holder in due course protections. Thus, IFC becomes an assignee of NorVergence, subject to any defenses that would void the contract as to NorVergence. Here, because the rental agreements were part and parcel of the services to be provided, when NorVergence stopped delivering the promised services, the contracts failed. *See Custom Data v. Preferred Capital*, 274 Mich. App. 239, 244-47 (Mich. Ct. App. 2006) (in action against a different NorVergence finance company, the court, upholding summary judgment for the consumer, found that the NorVergence rental agreements were part of a total communications package that included services, and affirmed the lower court finding that "since the services were not provided, the whole contract fails"). Under these circumstances, the contracts are voidable.

---

[19] Pre-contractual representations may be used to prove fraud in the inducement because evidence of fraud outside the contract is admissible as an exception to the parol evidence rule. *Faust Printing, Inc., v. MAN Capital Corp.*, 2006 U.S. Dist. LEXIS 44140 at *24-25 (N.D. Ill. June 16, 2006).

[20] See the discussion of IFC's knowledge at pp. 14-18, *supra.* A person has notice of a fact under Illinois law when he has actual knowledge of it, he has received a notice or notification of it, or "from all the facts and circumstances known to him at the time in question he has reason to know that it exists." 810 Ill. Comp. Stat. 5/1-201(25). "Notice, knowledge or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence." 810 Ill. Comp. Stat. 5/1-201(27). Here, IFC had the requisite notice. *See In re Application of County Collector*, 48 Ill. App. 3d 572, 588 (1977) (purchaser of real property charged with notice of prior, unregistered claim was found not to be bona fide purchaser because she had knowledge of facts which would put a reasonable person on inquiry, and was therefore chargeable with knowledge of other facts which would have been discovered on diligent inquiry); *Winter & Hirsch v. Passarelli*, 122 Ill. App. 2d 372, 378 (1970) (purchaser of note denied holder in due course status after court found that purchaser intentionally kept itself in ignorance of certain facts which, if known, would have destroyed holder in due course status). *See also Hatton v. Money Lenders & Assocs., Ltd.*, 127 Ill. App. 3d 577, 581 (1984) (absence of intentional maintenance of ignorance noted when distinguishing case at issue from *Passarelli*).

### *Fraud in the Factum Voids the NorVergence Contracts*

Even if IFC were found to be a holder in due course, under Illinois law the rental agreements are void because they were obtained through fraud.  Defenses available against a holder in due course include:

> a defense of the obligor based on (i) infancy of the obligor to the extent it is a defense to a simple contract, (ii) duress, lack of legal capacity, or illegality of the transaction which, under the law, nullifies the obligation of the obligor, (iii) fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms, or (iv) discharge of the obligor in insolvency proceedings.  810 ILCS 5/3-305(a)(1).

In discussing the fraud defense, the Illinois code (incorporating the comments of the UCC) explains that:

> Subsection (a)(1)(iii) refers to "real" or "essential" fraud, sometimes called fraud in the essence or fraud in the factum, as effective against a holder in due course. The common illustration is that of the maker who is tricked into signing a note in the belief that it is merely a receipt or some other document.  The theory of the defense is that the signature on the instrument is ineffective because the signer did not intend to sign such an instrument at all.  Under this provision the defense extends to an instrument signed with knowledge that it is a negotiable instrument, but without knowledge of its essential terms.  The test of defense is that of excusable ignorance of the contents of the writing signed. The party must not only have been in ignorance, but must also have had no reasonable opportunity to obtain knowledge.  In determining what is a reasonable opportunity all relevant factors are to be taken into account, including intelligence, education, business experience, and ability to read or understand English of the signer.  Also relevant is the nature of the representations that were made, whether the signer had good reason to rely on the representations or to have confidence in the person making them, the presence or absence of any third person who might read or explain the instrument to the signer, or any other possibility of obtaining independent information, and the apparent necessity, or lack of it, for acting without delay.

"Official Comment," 810 Ill. Comp. Stat. 5/3-305 cmt. (1992).  Fraud in the execution has been described as deceiving a party to an agreement as to the very nature of the instrument he signs so that the party actually does not know what he is signing, or does not intend to enter into a contract at all.  Fraud in the execution results in the agreement being void *ab initio*.  *Laborer's Pension Fund v. A&C Envtl., Inc.,* 301 F.3d 768, 779 (7th Cir. 2002).

Here, oral misrepresentations combined with confusing statements in the documents themselves tricked consumers into signing the equipment rental agreements.  As the undisputed

facts show, NorVergence salespeople routinely misrepresented to consumers that they were merely signing a non-binding application, and that the paperwork was necessary "to reserve the unlimited calling facilities with a nonbinding services and hardware application." [SJ Fact 22] Salespeople directed consumers not to read the documents or told consumers that the documents must be signed or the deal would be lost. [SJ Fact 32] Even a consumer who read the documents in the application package would have been confused by the claims in the "Non-Binding Hardware Application" that the Equipment Rental Agreement was not binding or the statements in the "Non-Binding Services Application" that "final consent of all parties" was necessary to move forward. [SJ Facts 16, 17] Under these circumstances, consumers were tricked into signing what they believed to be non-binding applications.[21] They had no reason to scrutinize the documents to the same degree that they might an immediately non-revocable, binding contract, and no reason to mistrust the believable representations of the salespeople concerning the nature of the documents that they were signing. [SJ Facts 33, 34, 35] Not only were the documents not described as contracts, but because of the representations that the consumer was signing up for a complete package of services and equipment, consumers did not understand that the essential nature of the contract related only to equipment. [SJ Fact 33]

At least two juries confronted with these facts have found the NorVergence contracts void and denied enforcement by IFC on that ground. *Specialty Optical v. IFC Credit Corp.*, Cause No. 04-04187-C (Tex. Dallas County Ct. at Law No. 3 heard on Feb. 8, 2006) (June 5, 2006) (NorVergence contract found to be void *ab initio* and thus not enforceable by IFC) (attached for the court's convince as PSJX 52); *IFC Credit Corp. v. United Bus. & Indust'l Fed. Credit Union,* 512 F.3d 989, 994-95 (7th Cir. 2008) (remanding for new trial, but noting that the jury had previously found fraud in the factum). *See also IFC Credit Corp. v. Burton Indus., Inc.,* 2007 U.S. Dist. LEXIS 46580 at *10-12 (N.D. Ill., June 25, 2007) (entering summary judgment for defendants; finding that their contract with NorVergence was not valid because of no

---

[21] The tactics used to obtain consumers' signatures on the delivery and acceptance certificate were similarly deceptive. Presented to consumers as nothing more than a routine delivery receipt, consumers signed to agree that the Matrix box had been delivered, not that the box – which was not yet installed or providing services – conformed to their expectations. [SJ Facts 39-42]

satisfaction of a condition precedent, i.e., that the equipment was not installed, and that IFC could not enforce an invalid contract).

IFC has known that the equipment rental agreements were both voidable and void *ab initio* for some time. It appears to be engaged in nothing more than a collections campaign designed to bludgeon small businesses into paying debts they do not owe. Where, as here, a practice produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition, the injury to consumers is not outweighed and the practice is unfair. *Windward Mktg.,* 1997 U.S. Dist. LEXIS 17114 at *32 (*citing Orkin,* 849 F.2d at 1365).

**B.      Filing in Distant Forum Unfair**

Count III of the FTC's complaint alleges that, in these circumstances, where consumers have valid defenses to the actions, and IFC knows it, IFC's practice of filing lawsuits to collect on equipment rental agreements in venues other than the consumer's place of business, the location where the consumer executed the contract, or the residence of the individual guarantor, causes or is likely to cause substantial injury that is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or competition. Thus, the practice is unfair. The facts supporting this count are undisputed even while the legal conclusions to be drawn remain contested. The issue is ripe for summary judgment.

**1.      Filing Suits in Distant Forums Causes Substantial Injury**

IFC has filed hundreds of collection suits in Illinois, a forum distant from nearly all the consumers it has sued. [SJ Fact 84] Its practice of filing distant forum actions has caused consumers substantial harm. [SJ Facts 85, 87] For those consumers who defend the suits, their distance from the court greatly increases their costs. [SJ Fact 85] Neither they nor any of the potential witnesses to the original transaction are in the court's jurisdiction. [SJ Fact 85] Compounding this harm, every consumer in this case has viable defenses and good reason to refuse payment on the Rental Agreements. *See* pp. 21-27, *supra.* Worse still, all but one of the collection suits were filed by IFC *after* the NorVergence bankruptcy, when IFC knew that no consumer would ever receive the services for which they had contracted and that the consumers had valid defenses to the collection action. [SJ Fact 86] Under such circumstances, IFC is literally banking on obtaining default judgments or forcing settlements with consumers who

make the rational economic choice to pay a settlement rather than pay to defend the action in a distant forum.  [SJ Fact 87]

### 2.    Injury Caused by Distant Forum Filings Not Avoidable

Consumers could not reasonably have avoided the harm here.  NorVergence assigned the Rental Agreements to IFC without any advance notice to the consumer.  Similarly, IFC's decision to sue in Illinois was beyond the consumer's control or ability to negotiate, other than hiring a lawyer in Illinois (after the fact) to seek a change of forum.

### 3.    Harm to Consumers Not Outweighed by Benefits to Competition Under the Circumstances

Finally, under these circumstances, the substantial injury to consumers caused by IFC's practice is not outweighed by benefits to consumers or competition.  Finance companies such as IFC do save costs by centralizing their litigation in a single forum (one of the reasons why in a different circumstance the use of distant forum litigation might readily be found wholly acceptable), but this benefit is dwarfed by the consumer harm here, where consumers with valid defenses may be effectively precluded from raising them because of the additional costs imposed by litigating in a distant forum.  Because these contracts are legally void and voidable, the cost savings to IFC of being able to sue in Illinois in order to obtain default judgments should not properly be considered a countervailing benefit – it's more akin to obtaining payments by extortion.

### 4.    Distant Forum Collections Legally Unfair

The unfairness of distant forum collection suits that impose undue costs on consumers is well established.  The Seventh Circuit unambiguously upheld the FTC's finding that the use of distant forum lawsuits was unfair under Section 5 of the FTC Act.  *Spiegel, Inc., v. FTC*, 540 F.2d 287, 294 (7th Cir. 1976).[22]  Although the language of the Seventh Circuit decision focuses on consumer transactions, the underlying Commission decision upheld by the court applied to suits against small businesses as well as to suits against consumers.[23]

---

[22]    The Commission's rationale included the costs of defending in a distant forum.  *Spiegel,* 540 F.2d at 293.

[23]    As stated in the Initial Decision adopted by the full Commission, "A customer of a mail-order house, be it an individual *or a small company* engaged in a one-state operation, is also more likely to be unprepared to defend itself in a foreign forum than is a company . . . which transacts a substantial amount

Commission action against distant forum clauses is not precluded even where particular distant forum clauses might be found enforceable in private contract actions. The legal analysis finding that personal jurisdiction is properly invoked under state law is far different from the analysis necessary for finding that a practice is unfair under the FTC Act. As the Seventh Circuit observed, "[T]he Commission may find [the distant forum] practice to be unfair within the meaning of Section 5 even though the same practice has repeatedly withstood attack in the courts." *Spiegel,* 540 F.2d at 294-95 (footnote omitted). Thus, the recent decision in *IFC v. Aliano Bros. Gen'l Contractors, Inc.,* 437 F.3d 606 (7th Cir. 2006), does not preclude a finding that IFC's practice of enforcing collection actions in distant forums, especially when it knows that valid defenses exist that defeat the claim, is unfair under Section 5 of the FTC Act. In *Aliano*, the Seventh Circuit found that the particular floating venue provision in the NorVergence Equipment Rental Agreement validly conferred personal jurisdiction in a diversity action under both Illinois and federal law unless Aliano could demonstrate it was "procured by fraud" or otherwise invalid. *Aliano Bros.*, 437 F.3d at 613. *Cf. Preferred Capital, Inc., v. Sarasota Kennel Club*, *Inc.,* 489 F.3d 303 (6th Cir. 2007) (finding that the floating venue provision in NorVergence's rental agreement was not enforceable where the Ohio Supreme Court had previously held that such a clause violated state public policy).

In addition to the different legal analysis applied under the FTC Act, as discussed above, the undisputed facts show that the NorVergence equipment rental agreements were in fact procured by fraud. Under such circumstances, the *Aliano* result is not controlling. Here, IFC's practice of filing distant forum collection suits, when it was abundantly clear that the rental agreements had been procured through fraud and that valid defenses existed against IFC's claims, satisfies all three elements of the test for unfairness and violates the FTC Act.

## C.     IFC's Deceptive Claims Violate Section 5

Count I of the Complaint alleges that IFC made deceptive statements to consumers in violation of Section 5 of the FTC Act, specifically including 1) that consumers have no defenses or counterclaims against legal action by IFC and 2) that consumers defrauded IFC into paying

---

of interstate business." *In re Spiegel, Inc.,* 86 F.T.C. 425, 439, 1975 FTC LEXIS 107 at *14-15 (1975) (citation omitted) (emphasis added); *aff'd with minor changes not related to the quoted text*, *Spiegel,* 540 F.2d at 295-97.

NorVergence for the Rental Agreements. The facts supporting this count are not controverted – IFC made these express representations and they were false – and as a legal matter, the FTC is entitled to summary judgment.

### *Misrepresentations that Consumers are Unconditionally Obligated to Pay IFC*

In letters sent to consumers and in telephone contacts with consumers, IFC has represented that consumers are unconditionally obligated to pay on the equipment rental agreements even when the consumers are no longer receiving the services necessary to render the equipment useful. [SJ Fact 89] IFC has further told consumers that the consumers have no defenses to IFC's collection actions. [SJ Fact 90] These express claims were false and are presumed material. *Kraft, Inc.,* 970 F.2d at 322.

In fact, consumers are not unconditionally obligated to pay on the NorVergence contracts. Consumers have numerous defenses and counterclaims, arising both from the NorVergence fraud and from IFC's own misdeeds. Consumers have a legal right under the contracts to assert defenses – including that IFC was not a holder in due course, that the waiver of defenses clause is not enforceable, that defenses against NorVergence are also defenses against IFC and thus the contracts are voidable, and that NorVergence committed fraud *in factum* that voided the entire contract. *See* pp. 21-27, *supra.*

Deceptive practices under Section 5 of the FTC Act include misrepresenting legal rights to consumers. *FTC v. Verity Int'l, Ltd.*, 335 F. Supp. 2d 479, 497 (S.D.N.Y. 2004), *aff'd in part, remanded on other grounds*, 443 F.3d 48 (2d Cir. 2006) (upholding deception count but remanding on calculation of damages). In *Verity*, the district court found that the defendants violated Section 5 of the FTC Act because they falsely "represented to consumers that they were legally obligated to pay for the Internet services provided by defendants' clients." 335 F. Supp. 2d at 497. *See also FTC v. Datacom Mktg. Inc.*, No. 06 C 2574, 2006 U.S. Dist. LEXIS 33029 at *13 (N.D. Ill., May 24, 2006) (in preliminary injunction order, FTC likely to prevail on claim that falsely "threatening . . . potential legal action against consumers who challenged the defendants' claims for money" was deceptive). In another statute enforced by the Commission, the Fair Debt Collection Practices Act ("FDCPA"), Congress made it a deceptive act for a debt collector to "misrepresent the character, amount, or legal status of any debt . . . ." 15 U.S.C. § 1692e(2)(A). The FDCPA has been held to cover statements made in the course of litigation.

*Sayyed v. Wolpoff & Abramson*, 485 F.3d 226 (4th Cir. 2007). IFC's practice of telling consumers that they are unconditionally obligated to pay on the worthless agreements is a false, misleading, and deceptive practice under the FTC Act.

### False Statements That Consumers Misrepresented to IFC the Status of Their Equipment

IFC also misrepresented to consumers that the consumers have to pay IFC because *the consumers* defrauded IFC by signing the delivery and acceptance certificate. [SJ Fact 91] IFC bases this representation solely on the facts that the consumers signed the delivery and acceptance form and confirmed during IFC's verbal audit that they had received the equipment, thus causing IFC to pay NorVergence for the Rental Agreements. [SJ Fact 92] This preposterous charge was made in a letter that IFC sent to consumers in June 2005 and even included in some of IFC's collections actions against consumers. [SJ Fact 91] While intent to deceive is not a required element of proof under Section 5 of the FTC Act, these statements reek of intentional falsity designed to coerce consumers into paying.

In fact, both the delivery and acceptance certificate and the verbal audit were critical components of NorVergence's deception of consumers. [SJ Facts 39-42, 77-80] The delivery and acceptance certificate was signed at the time that the Matrix box was delivered. At that point it was never connected to the consumers' phone system or a T-1 line and was not in any way operational. [SJ Fact 39] As discussed above, the delivery person required the consumer to sign for receipt of the package before he left, just as one regularly signs for packages received from FedEx or UPS. [SJ Fact 41] There was no meeting to discuss the document, and no explanation about the Matrix box or when service might be connected, just a quick "I need you to sign this" from the delivery person. [SJ Fact 41] Under these circumstances it was wholly implausible to expect the consumer to understand that the document might be imbued with any legal significance beyond an agreement that the equipment had been delivered.

The verbal audit, conducted by IFC shortly after the Matrix box was delivered, but long before any services were connected, is similarly misleading. [SJ Fact 77] It asks only if the consumer's address is "the address where the equipment was delivered and mounted," and then promises that the monthly rental cost "is protected for a 60-month term, producing the NorVergence savings that you were promised." [SJ Fact 77] If questioned, the verifier was supposed to say that they were only "confirming some basic information about the equipment

rental." IFC's verbal audit was carefully crafted by NorVergence, and so used by IFC, to avoid asking any questions that might indicate to consumers that they would have to pay for the Matrix even if they did not receive the promised services. This audit script was materially different from IFC's standard verbal audit and, if anything, was designed to trick the consumer, not the other way around. [SJ Facts 77, 78]

IFC knew that most consumers had received no services from NorVergence at all, and that not one consumer had service installed at the time that the equipment was delivered, the delivery and acceptance certificate signed, and the verbal audit completed. [SJ Facts 39, 77] IFC knew that there was no way that the consumers could assess the quality and performance of the Matrix box itself because it was useless without the promised phone services. [SJ Facts 82, 83] IFC also knew that consumers were the true victims here, tricked into signing a contract that misstated the consideration and purported to separate the consumers' duty to pay for the equipment from NorVergence's duty to provide services, even though the promised deal was for an interrelated package of both services and equipment that together would produce monthly telecommunications savings. [SJ Facts 50-83]

IFC's representations that it relied on consumers' statements, when it knew those statements were obtained through trickery and deception, and were based on consumers' incomplete understanding of their legal significance, are false. Such express claims are deemed material. *In re Southwest Sunsites, Inc., 105 F.T.C 7, 154 (1985)* ("There can be no benefit to society from the dissemination of misrepresentations that induce consumers to continue making payments that they might very well have terminated if they had not been misinformed."). Thus, IFC's statements are material as a matter of law.

IFC's direct representations to consumers are deceptive and violate Section 5 of the FTC Act. Summary judgment for the FTC should be granted on this count.

### D. This Court Has the Authority to Impose the Requested Relief

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) (1994), authorizes this Court to exercise the full breadth of its equitable authority necessary to accomplish complete justice. *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 572 (7th Cir. 1989). That relief can include such injunctive remedies as rescission of contracts and monetary restitution to consumers for losses resulting from defendants' unlawful conduct. *See id.* at 571-72. *See also FTC v. Febre*, 128 F.3d 530,

536 (7th Cir. 1997); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1019 (N.D. Ind. 2000), *aff'd*, 312 F.3d 259 (7th Cir. 2002).[24]

### 1.    Injunctive Relief

Here the injunctive relief sought by the FTC is narrowly tailored to prohibit IFC from engaging in conduct like that described here in other leasing deals and also to redress the injuries suffered by consumers.  Thus, the FTC requests that an order be entered that prohibits IFC from misrepresenting to consumers:

● the nature, terms, or predominant purpose of any finance agreement;

● that the consumers have waived any defenses, or are precluded from raising any defenses or counterclaims, to defendant's collection on any finance contract;

● that consumers are obligated to pay defendant under any other theory of liability including but not limited to fraud or misrepresentation.

The FTC further requests that IFC be prohibited from taking any action to collect on a finance contract when the information it possessed at the time it acquired the contract showed that:

● the contract misstated the consideration to be received by the customer, including but not limited to statements that the consideration was only equipment when the consideration expected by the consumer included substantial services; or

● there was a reasonable likelihood the contract was procured by deception.

Finally, the FTC requests that, when there is a reasonable likelihood a customer has a nonfrivolous defense to payment on a finance contract, IFC be prohibited from filing a lawsuit to collect on the contract in a county other than one in which the consumer has its principal place of business or in which the consumer signed the contract sued upon or, in the case of a natural person acting as guarantor for a business, the county of that person's residence.

---

[24] Defendants have previously suggested that the relief that this Court can impose is somehow constrained by private settlements agreed-to by individual consumers on state contract law claims.  The short answer to that suggestion is that nothing could be further from the truth.  The FTC is vindicating public rights, not acting in a representative capacity, so its authority to obtain monetary equitable relief is unaffected by private settlements.  This Court is being asked to apply federal law to federal law questions.  For a longer answer, see the FTC's Supplemental Memorandum Regarding Court's Equitable Authority to Order Full Relief for All Consumers, filed on March 14, 2008.  [Docket #122].

To remedy the non-monetary injury to consumers caused by IFC's practices, the FTC also requests that IFC:

- cease all collections on NorVergence contracts, including dismissing with prejudice all pending lawsuits;

- file satisfactions of judgment as to every judgment it has obtained against NorVergence consumers;

- ensure all negative credit information about any debt owed to IFC as a result of the NorVergence rental agreements be removed from consumers' credit reports; and

- send notice to all NorVergence consumers describing the above relief.

### 2. Restitution

A major purpose of the FTC Act is to protect consumers from economic injury. *Febre*, 128 F.3d at 536. Courts have regularly awarded, as equitable ancillary relief, the full amount lost by consumers. *Id. See also FTC v. Gem Merchandising Corp*., 87 F.3d 466 (11th Cir. 1996) (affirming an award of damages as calculated by consumers' losses). The proper measure of restitution is the amount that will restore the victims to the status quo ante, not what the defendants received. *FTC v. Gill*, 265 F.3d 944, 958 (9th Cir. 2001) (finding that the district court properly used the amount consumers paid as the measure for the amount defendants should be ordered to pay for their wrongdoing). This is true in cases brought under the FTC's unfairness authority as well as its deception authority. *Windward Mktg.,* 1997 U.S. Dist. LEXIS 17114 at *44-45 (finding that the full amount lost by consumers was the appropriate equitable remedy for defendants to pay; specifically rejecting the defendants' argument that the monetary relief ordered be limited to defendants' profits). Under existing precedent, to redress the substantial harm caused to consumers by IFC's practices, IFC should be required to pay restitution, measured as the full amount paid to them by consumers, more than $4 million. [SJ Fact 94]

### 3. Reporting Requirements

Finally, order provisions calling for monitoring, records retention, and reporting are necessary to ensure compliance by defendants. Courts routinely include such provisions in permanent injunctions issued under Section 13(b) of the FTC Act. *See, e.g., FTC v. SlimAmerica, Inc*., 77 F. Supp. 2d 1263, 1276 (S.D. Fla. 1999) (record-keeping and monitoring

*FTC's Motion and Memo in Support of Summary Judgment – Page 34*

provisions appropriate to allow FTC to police the defendants' compliance with the order); *FTC v. Alliance Commct's, Inc*., 1997-1 Trade Cas. (CCH) P 71,685 (S.D. N.Y. 1996) (same); *FTC v. Sharp*, 782 F. Supp. 1445, 1456-57 (D. Nev. 1991) (monitoring).

## V.    CONCLUSION

For the above stated reasons, the FTC respectfully requests that summary judgment be entered forthwith.

Dated: March 28, 2008                              Respectfully submitted,


                                                   s/ Robert J. Schroeder
                                                   _____
                                                   ROBERT J. SCHROEDER
                                                   DAVID M. HORN
                                                   MAXINE R. STANSELL
                                                   Federal Trade Commission
                                                   915 2nd Avenue, Ste. 2896
                                                   Seattle, WA 98174
                                                   Tel: (206) 220-6350
                                                   Fax: (206) 220-6366
                                                   Rschroeder@ftc.gov
                                                   Dhorn@ftc.gov
                                                   Mstansell@ftc.gov

                                                   THERESA M. McGREW
                                                   Federal Trade Commission
                                                   55 West Monroe, Suite 1825
                                                   Chicago, IL 60603
                                                   Tel: (312) 960-5634
                                                   Fax: (312) 960-5600
                                                   ATTORNEYS FOR PLAINTIFF
                                                   FEDERAL TRADE COMMISSION

## **CERTIFICATE OF SERVICE**

I, Robert J. Schroeder, one of the attorneys for the FTC in this matter, hereby certify that I will serve the appended motion upon the following counsel for Defendant IFC by filing the motion electronically through the Court's ECF system, which notifies each of them by email:

Beth Anne Alcantar balcantar@ifccredit.com

Vincent Thomas Borst vtborst@askborst.com

David Alexander Darcy adarcy@askounisdarcy.com

Debra Rose Devassy ddevassy@skounisdarcy.com

Kenneth D. Peters kpeters@skounisdarcy.com

Stephen Charles Schulte sschulte@winston.com, ECF_CH@winston.com

Jeffrey Mark Wagner jwagner@winston.com, ECF_CH@winston.com
Justin Leinenweber jleinenweber@winston.com


and that I will send it directly by email to:

Peter Deeb, pdeeb@fpdb.com


and that I will take these steps no later than today, March 28, 2008.


s/ Robert J. Schroeder

_____

ROBERT J. SCHROEDER

*FTC's Motion and Memo in Support of Summary Judgment – Page 36*