# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | No. 07 C 3155 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| IFC CREDIT CORP., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

NorVergence, Inc. leased telecommunications equipment to small businesses, religious and other non-profit organizations as part of an integrated package of telecommunications services. The *consumers*–as we shall see, this is the appropriate designation under §5 of the Federal Trade Commission Act ("FTCA")–were promised "dramatic savings" on the telecommunications services as the result of the "supposedly wondrous equipment," which NorVergence called a "Merged Access Transport Intelligent Xchange (MATRIX) device," *IFC Credit Corp. v. United Business & Industrial Federal Credit Union*, 512 F.3d 989, 991 (7th Cir. 2008)(Easterbrook, C.J.), with its supposed "proprietary technology." (*Complaint* ¶13-14). But like the world in the Wachowski brothers' film, The Matrix, NorVergence's MATRIX was an illusion, incapable of doing the things NorVergence's salesmen claimed since it was merely a standard integrated access box that cost NorVergence only a few to several hundred dollars to buy. (*Complaint* ¶ 13).

The transactions, like most successful schemes to defraud, were "dressed in the garb of honesty and hedged about with all the appearances of legal and enforceable undertakings." *Brooks v. United States*, 146 F.223 (8th Cir.1906). The transactions were structured so that the Equipment

Rental Agreements ("ERAs") appeared as stand-alone agreements that made no mention of the telecommunications services (Complaint ¶¶ 8, 18), even though without those services the MATRIX boxes served no purpose, and the transactions would never have been entered into. Of the total monies due for service and equipment, the bulk was allocated to rental of the MATRIX box.

The ERAs contained a provision that is known in the equipment leasing industry as a "hell or high water" clause. *In re United Air Lines, Inc.*, 447 F.3d 504, 507 (7th Cir. 2006). In other words, the consumer must pay the rental fee for the equipment no matter what. Of course, the customer might have had defenses against NorVergence had there been a cessation of telecommunications services. *See e.g., RSACO, LLC. v. Resource Support Associates, Inc.*, 208 Fed.Appx. 632 (10th Cir. 2006). The scheme thus required that NorVergence assign the ERAs, thereby insuring, at least theoretically, that an assignee could insist on monthly lease payments even if there were an interruption or cessation of telecommunications services.

IFC, a privately held Illinois corporation in the equipment leasing business, sometimes purchases portfolios of equipment leases from other companies. Between 2003 and 2004, it purchased from NorVergence at a substantial discount about 800 of the ERAs with a face value of $21 million. The complaint charges that after three years, NorVergence's scheme collapsed, leaving the lessees with no telecommunications services, a worthless MATRIX box, and lease payments that in some cases approached $160,000. IFC insisted on continued monthly payments and filed hundreds of cases in forums distant from the residences of many of the defendants pursuant to the forum selection clause in the ERAs. So long as IFC could claim to be a holder in due course, it would be unfettered by any defenses that the lessee might have against NorVergence and could demand payment on the leases even if there had been a termination of telecommunications services.

*Cf. IFC Credit Corp.*, 512 F.3d at 989.

The Federal Trade Commission sued NorVergence for fraud and obtained a default judgment. It has brought the present action seeking to bar IFC from collecting on the MATRIX leases. Count I charges that in its attempts to collect the payments under the ERAs, IFC made deceptive statements in violation of § 5, consisting of statements to customers that they are unconditionally obligated to make payments under the rental agreements and that they had no defenses. Drawing all reasonable inferences in favor of the FTC, Count II charges that IFC should have known that the lessees thought that the predominant purpose of their transactions with NorVergence was the purchase of telecommunications services–not the rental of the Matrix box-- that the ERAs, themselves, and other information available to IFC demonstrated the *likelihood* that the consumers were deceived into signing the ERAs (*Complaint*, ¶31)(emphasis supplied), and that IFC's acquisition and enforcement of the ERAs is an unfair practice under § 5 of the FTCA. 15 U.S.C. § 45. Finally, Count III charges that IFC's invocation of the forum selection clause is an unfair practice because it allows IFC to bring suits to collect lease payments in a forum hundreds or thousands of miles away the residences of the affected consumers.

IFC has moved to dismiss all three counts for failure to state a claim on which relief can be granted. Rule 12(b)(6), Federal Rules of Civil Procedure. Although the arguments are count-specific, common to all is the contention that the lessees are "small businesses," religious and other not-for-profit organizations and thus are not "consumers" within the meaning of the Federal Trade Commission Act – a status IFC insists only includes natural persons who have purchased goods or services normally used for personal or household use.

Needless to say, the parties insist that their interpretation of "consumer" in the FTCA is the

right one and the only one consistent with the text of the Act, its legislative history, and the FTC's own prior applications. Yet, they do agree that this is a case of first impression, and that no prior case has explicitly dealt with the question. One case involved unfair or deceptive practices directed against business entities, *F.T.C. v. Cyberspace.com LLM*, 453 F.3d 1196, 1198 (9th Cir. 2006), but the issue was not raised or discussed there, and thus it does not answer the question of how the term "consumer," in the FTCA is to be defined. Prior cases have precedential value only when there has been a deliberative consideration of the issue at hand. *Sub-silentio* or assumptive resolution is not enough. *See Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993); *United States v. Moore*, __F.3d__ (7th Cir. 2008), 2008 WL 818007 at * 2; *United States v. Rodriguez-Rodriguez,* 453 F.3d 458, 460 (7th Cir. 2006); *Petrov v. Gonzales*, 464 F.3d 800, 802 (7th Cir. 2006).

## I.
## FACTUAL BACKGROUND
### A.
### NorVergence And The Equipment Rental Agreements

NorVergence was a New Jersey company that purchased telecommunications services from common carriers and resold those services to its customers as part of an integrated, long-term package that included landline, cellular telephone and internet services and the leasing of hardware that made usable those services. The customers were "small businesses and religious and other non-profit organizations, and individuals who personally guaranteed the obligations." (*Complaint*, ¶ 8). The sales pitch promised exceptional savings on telecommunications costs. NorVergence salespeople would review a potential customer's bills for landlines, internet, and cell phones, and make a written proposal that typically resulted in a 30% savings for a package of similar NorVergence services, not

to mention promises of unlimited long distance calling, unlimited cell phone minutes, unlimited internet service, and more. (*Complaint*, ¶¶ 8, 11-12).

NorVergence claimed it could achieve these stunning savings because of the MATRIX device. Of course that wasn't so: it was just a standard line splitter that came in two versions, the MATRIX 850 and the MATRIX Soho. The 850 was used to connect analog telephone equipment to a telecom provider's high bandwidth data line, while the Soho connected to a DSL or cable modem typically used to access Internet services. These devices cost NorVergence anywhere from $270 to $1300. The typical 60 month rental agreements could run as high as $60,000 to $120,000. (*Complaint*, ¶¶ 13-20).

Once the customer was on the hook – and perhaps as many as 60% found the lure of promised savings of 30% savings irresistible (*Complaint*, ¶¶ 12,32) – NorVergence had them sign not only the Equipment Rental Agreement, but several other documents: a "Customer Qualifying Questionnaire," an "Accurate Bill Receipt and Proposal Request," a "Receipt of Savings Guarantee Subject to Mutual Due Diligence & Acceptance by Engineering," a "Credit Application," a "Letter of Agency," a "No-Risk Reservation Agreement," a "Hardware Application," and a "Service Application." (*Complaint*, ¶ 16). The customers received itemized quotes of projected savings, which clearly stated that about 80% of the payments for the overall package would be for equipment rental. Each of the documents was just one or two pages in length. (*Exhibits Supporting Plaintiff's Motion for Preliminary Injunction*, Ex. K).

The ERA appeared to be a standard form equipment lease, covering both sides of a single page. It made no mention of telecommunications services and covered only the rental of the equipment necessary to provide the services. (*Complaint*, ¶ 8). Its terms were straightforward and understandable. The front side provided that the "renter" agreed that the equipment would "not be

used for personal, family or household purposes." Also on the first side, in bold type a bit above the signature line, the ERA stated that the **"obligations to make all Rental Payments for the entire term are not subject to set off, withholding or deduction for any reason whatsoever."** Directly over the signature lines, also in bold-faced type but capitalized as well, the ERA stated: **"THIS RENTAL MAY NOT BE CANCELLED OR TERMINATED EARLY."**

The ERAs also contained a "hell or high water" clause, *In re United Air Lines, Inc.*, 447 F.3d 504, 507 (7th Cir. 2006), unconditionally requiring payment of the monthly fee for the equipment. *See, e.g., Wells Fargo Bank, N.A. v. BrooksAmerica Mortgage Corp.*, 419 F.3d 107, 110 (2nd Cir. 2005); *Faust Printing, Inc. v. MAN Capital Corp.*, 2007 WL 4442325, at *4 (N.D.Ill. Dec. 14, 2007); *IFC Credit Corp. v. United Business & Indust. Federal Credit Union*, 474 F.Supp.2d 956, 959 (N.D.Ill. 2006), *rev'd on other grounds, IFC Credit Corp. v. United Business & Industrial Federal Credit Union*, 512 F.3d 989 (7th Cir. 2008). On the second column of the second side, in slightly larger, bold-faced type, and in all-caps, the ERA stated:

> **YOUR DUTY TO MAKE THE RENTAL PAYMENTS IS UNCONDITIONAL DESPITE EQUIPMENT FAILURE, DAMAGE LOSS OR OTHER PROBLEM. RENTER IS RENTING THE EQUIPMENT "AS IS", WITHOUT ANY WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE IN CONNECTION WITH THIS AGREEMENT. IF THE EQUIPMENT DOES NOT WORK AS REPRESENTED BY THE MANUFACTURER OR SUPPLIER, OR IF THE MANUFACTURER OR SUPPLIER OR ANY OTHER PERSON FAILS TO PROVIDE SERVICE OR MAINTENANCE, OR IF THE EQUIPMENT IS UNSATISFACTORY FOR ANY REASON, YOU WILL MAKE ANY SUCH CLAIM SOLELY AGAINST THE MANUFACTURER OR**

> **SUPPLIER OR OTHER PERSON AND WILL MAKE NO CLAIM AGAINST US.**

In addition, just above the consumer's initial line at the bottom of the second column of the

second side, the ERA also stated, in bold-faced type, mostly all-caps:

**NO WARRANTIES: We are renting the equipment to you "AS IS". WE MAKE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE IN CONNECTION WITH THIS AGREEMENT . . . You agree to continue making payments to us under this Rental regardless of any claims you may have against the supplier or manufacturer. YOU WAIVE ANY RIGHTS WHICH WOULD ALLOW YOU TO: (a) cancel or repudiate the Rental; (b) reject or revoke acceptance of the Equipment; (b) grant a security interest in the Equipment; (d) accept partial delivery of the Equipment; (e) "cover" by making any purchase or Rental of substitute Equipment; and (f) seek specific performance against us.**

**YOU UNDERSTAND THAT ANY ASSIGNEE IS A SEPARATE AND INDEPENDENT COMPANY FROM RENTOR/MANUFACTURER AND THAT NEITHER WE NOR ANY OTHER PERSON IS THE ASSIGNEE'S AGENT. YOU AGREE THAT NO REPRESENTATION,GUARANTEE OR WARRANTY BY THE RENTOR OR ANY OTHER PERSON IS BINDING ON ANY ASSIGNEE, AND NO BREACH BY RENTOR OR ANY OTHER PERSON WILL EXCUSE YOUR OBLIGATIONS TO ANY ASSIGNEE.**

The ERAs also included the following "waiver of defenses" clause, in bold-faced type, about three-quarters of the way down the first column of the second page:

**ASSIGNMENT: YOU MAY NOT SELL, PLEDGE, TRANSFER, ASSIGN OR SUBRENT THE EQUIPMENT OR THIS RENTAL. We may sell, assign or transfer all or any part of this Rental and/or the Equipment without notifying you. The new owner will have the same right that we have, but not our obligations. You agree you will not assert against the new owner any claims, defenses or set-offs that you may have against us.**

**B.**

**Exit NorVergence, Enter IFC**

In the autumn of 2003, NorVergence executed "Master Program Agreements" with perhaps as many as forty finance companies, including IFC, under which it sold the ERAs at a discount on the total rental price. *See IFC Credit Corp. v. Rieker Shoe Corp.*,378 Ill.App.3d 77, 881 N.E.2d 382 (1st

7

Dist. 2007); *National City Commercial Capital Corp. v. Gateway Pacific Contractors, Inc.*, 2007 WL 3232440, at *3 n.4 (S.D.Ohio 2007); *Preferred Capital, Inc. v. Sarasota Kennel Club, Inc.*, 489 F.3d 303, 305 (6th Cir. 2007); *Studebaker-Worthington Leasing Corp. v. Michael Rachlin & Co., LLC*, 357 F.Supp.2d 529, 531 (E.D.N.Y. Feb. 22, 2004). If the payments under the ERA over a five-year term were to be $65,000, for example, IFC would pay NorVergence $49,000. In the event of a default on the first payment, IFC could require NorVergence to buy back that agreement. (*Complaint*, ¶¶ 21-23).

As NorVergence's price quotes made clear, the payments were structured so that the bulk of what was paid came under the ERAs. When NorVergence sold the ERAs, its only ongoing income came from the small amounts that had been allocated toward telecommunications services. That income was inadequate to pay the service providers. The income it received from the assignment of the ERAs was used for purposes other than payment to telecommunications providers and what remained was insufficient to pay for the five years of telecommunications services the consumers thought they had contracted for. (*Complaint*, ¶25). NorVergence collapsed and went into involuntary Chapter 11 bankruptcy near the end of June 2004. (*Complaint*, ¶¶ 25-28).

Unsympathetic to the plight of the "lessees," IFC insisted on the monthly equipment rental payments. Indeed, particularly revealing of IFC's lack of good faith in the whole enterprise, according to the complaint, is the fact that IFC sought relief from the automatic stay in the Chapter 11 proceeding in order to take possession of security interests in over $15 million of ERAs that NorVergence still owned but which it had given to IFC at no cost. After the FTC and others objected to the lifting of the stay, IFC withdrew its petition. It was subsequently determined in the bankruptcy court that the unassigned rental agreements were void and unenforceable. (*Complaint*, ¶28).

By early 2004, IFC had learned from customers that the MATRIX equipment did not work,

and in some cases had not even been installed. A number of customers stopped making payments, while others continued to make payments with money provided by NorVergence in order to discourage IFC from exercising the buy-back provision in the "Master Program Agreement." (*Complaint*, ¶¶ 24, 26-27). IFC made some changes to that Agreement – including the addition of certain security interests – to limit its risks of financial loss given NorVergence's failure and impending bankruptcy. (*Id.*, ¶¶ 27-28). After that, IFC exercised its rights as assignee under the ERAs and insisted that the "hell or high water" clause required continued payments and that it was a holder in due course. When met with resistance, IFC initiated suits in Illinois seeking to collect the full value of the lease payments. (*Id.*, ¶¶29-30).

## C.
## Enter The FTC

The FTC disputes IFC's claim that it is an innocent assignee. Rather, it argues, the equipment leases and other information available to IFC demonstrated that the predominant purpose of the NorVergence transactions was the purchase of long-term telecommunications services, from which IFC should have known that there was a strong likelihood that the customers were deceived into signing the ERAs. (*Complaint*, ¶¶31-41).[1] NorVergence's cost savings sales pitch ought to have alerted IFC as well, the FTC claims. The complaint alleges that it should have been obvious to IFC that the minimal cost of the MATRIX boxes was unrelated to the significant rental fees over the term of the lease, and that those fees were instead intended by the lessees to cover the cost of services. The

---

[1] Implicit in the complaint is the contention that no one would have ever signed an agreement like the MATRIX lease agreement if they understood what they were actually obligating themselves to do. Of course, for purposes of the motion to dismiss, all the well-pleaded allegations in the complaint are accepted as true. There is however, no inevitability about the FTC's conclusions. It remains to be seen what the evidence will actually show.

9

complaint suggests that IFC's failure to have determined the value of those pieces of equipment, which the FTC says it ought to have done under generally accepted accounting principles and presumably the practice in the equipment leasing business, is evidence of IFC's awareness of the real nature of the transaction. (*Complaint*, ¶¶31-42).

# II.
# ANALYSIS
## A.
## The Motion To Dismiss

Rule 8(a) of the Federal Rules of Civil Procedure requires that a complaint contain a "short and plain statement of the claim showing that the plaintiff is entitled to relief." This "short and plain statement" must be enough "'to give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly,* – U.S. –, 127 S.Ct. 1955, 1964 (2007). Under *Twombly,* a plaintiff is obligated to provide the grounds of its entitlement to relief, and that requires more than labels and conclusions; a formulaic recitation of the elements of a cause of action will not do. *Id.* at 1964-65. "Factual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965. The Court did "not require heightened fact pleading of specifics," but did demand that the complaint to contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. *See also George v. Smith,* 507 F.3d 605, 608 (7th Cir. 2007).

This was a change in pleading jurisprudence, with the Court officially "retiring" *Conley's* fifty-year-old rule that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

entitle him to relief." *Twombly,* 127 S.Ct. at 1969; *E.E.O.C. v. Concentra Health Services, Inc.,* 496 F.3d 773, 777 (7th Cir. 2007)(noting cases relying on *Conley* are "no longer valid in light of the Supreme Court's recent rejection of the famous remark...."). Two weeks after *Twombly,* the Supreme Court again took up the issue of pleading standards – this time in the context of a *pro se* complaint – in *Erickson v. Pardus,* – U.S. –, 127 S.Ct. 2197 (2007). In *Erickson,* the Court said that "[s]pecific facts are not necessary" to meet the requirements of Rule 8(a). The Seventh Circuit has read the two cases together to say "that at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." *Airborne Beepers & Video, Inc. v. AT & T Mobility,* 499 F.3d 663, 667 (7th Cir. 2007). *See also Limestone Development Corp. v. Village of Lemont, Ill.,* _F.3d_, 2008 WL 852586 (7th Cir. 2008); *Killingsworth v. HSBC Bank Nevada, N.A.,* 507 F.3d 614, 619 (7th Cir. 2007).

The motion to dismiss does not question the factual sufficiency of the complaint. Rather, it contends that FTC has exceeded its regulatory authority because businesses and not-for-profit organizations not "consumers" within the meaning of the FTCA. The motion also contends that there is nothing unfair about its acquisition and enforcement of the ERAs, nothing deceptive about its collection activities, and nothing unfair about enforcing the ERAs in the Illinois courts. We begin with an analysis of § 5 of the Federal Trade Commission Act.

## B.
## The History Of Section 5 Of The Federal Trade Commission Act And The Meaning Of "Consumer"

The FTC has construed the term "consumer" to include businesses as well as individuals. Deference must be given to the interpretation of the agency charged by Congress with the statute's

11

implementation. *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 414 (1993). *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844 (1984); *F.T.C. v. Texaco*, 393 U.S. 223, 225-26 (1968); *Moran Foods, Inc. v. Mid-Atlantic Market Development Co., LLC*, 476 F.3d 436, 441 (7th Cir. 2007). If Congress has made its intent clear, the court and agency must give Congress's intent effect. *Chevron*, 467 U.S. at 842-43. If Congress's intent is not clear or is silent or ambiguous with respect to the specific issue, the agency's construction is given deference if "based on a permissible construction of the statute." *Shalala*, 508 U.S. at 414; *Arnett v. C.I.R.*, 473 F.3d 790, 793 (7th Cir. 2007). Courts should defer to an agency's position on construction "unless the legislative history or the purpose and structure of the statute *clearly reveal a contrary purpose on the part of Congress*." *Chemical Manufacturers' Association v. Natural Resources Defense Council, Inc.* 470 U.S. 116 (1985)(emphasis added). No such purpose exists here, and the FTC's construction of the FTCA is reasonable and is supported by the text and history of the Act.

## 1.

In broad and unambiguous terms, the FTCA declares "unlawful" "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce. . . ." 15 U.S.C. § 45 (a)(1). The Act explicitly "empower[s] and direct[s] [the Commission] to prevent persons, partnerships, or corporations. . . from using [ such] unfair methods of competition . . . and [such] unfair or deceptive acts or practices. . . ." 15 U.S.C.A. § 45(a)(2).[2] The Act empowers district courts to redress injury to "consumers" or others resulting from an unfair or deceptive act or practice. 15 U.S.C. §57b(b).

---

[2] In its current form, § 5 contemplates two distinct practices, those that the FTC deems to be "unfair" and those it deems to be "deceptive." A practice may be unfair without being deceptive. *Orkin Exterminating Co., Inc. v. F.T.C.*, 849 F.2d 1354, 1367 (11th Cir. 1988)

The broad directive to the FTC must be read in the context of subsection (n), which requires as a precondition to the FTC's authority to declare an act or practice to be "unfair" that it be one that "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. §45(n).[3] In making that determination, the Commission "may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination." *Id.*

For the first 80 years of its existence, the FTCA contained no comparable provision. The 1914 Federal Trade Commission Act, which established the Federal Trade Commission, prohibited only unfair methods of competition in commerce. *F.T.C. v. Winsted Hosiery* Co., 258 U.S. 483 (1922); *F.T.C. v. Texaco, Inc.*, 393 U.S. 223, 225 (1968). At the time of the FTCA's enactment, Congress, recognizing the impossibility of defining all unfair practices, chose not to attempt a statutory definition of the term, "unfair methods of competition." *See American Financial Services Ass'n v. F.T.C.*, 767 F.2d 957, 965 (D.C. Cir. 1985), *cert. denied*, 475 U.S. 1011 (1986). This broad grant of discretionary authority was met with some judicial resistence. Subsequent judicial and congressional action rejected these attempts at circumscription on the FTC's authority. 767 F2d at 966. In 1934, the Supreme Court concluded that neither the language nor the history of the Act suggested that Congress intended to confine the proscribed acts or practices "to fixed and unyielding categories."

_____

[3]Although IFC denies it (*Reply* at 7), subsection (n) by its plain and unambiguous terms does not apply to "deceptive" acts or practices. Though we may not always end with the words of a statute, one must begin there. *Engine Mfrs. Ass'n v. South Coast Air Quality Management Dist.*, 541 U.S. 246, 252 (2004). "There are times when adherence to this simple rule can be not only the first step in the interpretative process but the last." Henry J. Friendly, *Mr. Justice Frankfurter And The Reading Of Statutes*, Collected in Friendly, Benchmarks 196, 202 (1967). As it relates to the application of §45(n) to deceptive as opposed to unfair practices, this is such a case.

*F.T.C. v. R.F. Keppel & Bros., Inc.*, 291 U.S. 304, 310 (1934). *See also F.T.C. v. Sperry & Hutchinson Co.,* 405 U.S. 233, 241 (1972).

In 1938, Congress enacted the Wheeler-Lee Amendment to § 5 of the Act, which added the phrase, "unfair or deceptive acts or practices," to the section's original ban on "unfair methods of competition." *See* 15 U.S.C. §45(a). One of the primary purposes of the Amendment was to expand the powers of the FTC over unfair methods of competition by extending its jurisdiction to cover deceptive acts or practices, thereby granting "the Commission authority to protect consumers as well as competitors." *American Financial Services Ass'n*, 767 F.2d at 966. *See Sperry & Hutchinson Co.,* 405 U.S. at 243-244. "'In other words, the [Wheeler-Lee Amendment] makes the consumer who may be injured by an unfair trade practice, of equal concern, before the law, with the merchant or manufacturer injured by the unfair methods of a dishonest competitor.'" *American Financial Services Ass'n*, 767 F.2d at 966-967. Nothing in the purpose or text of the Amendment supports the thesis that Congress intended that only individuals purchasing goods or services normally used for personal or household purposes were within the FTCA's protective ambit, as IFC contends.

The Wheeler-Lee Amendment was only a partially effective anodyne since the scope of the FTC's authority in promoting fair and free competition and safeguarding the consumer public against unfair or deceptive acts or practices was limited to matters "in commerce" and by being made to rely solely on the cease and desist order procedure for enforcement. *Id.* Thus, Congress enacted the Magnuson-Moss Warranty Act and the Federal Trade Commission Improvement Act in 1975 as Titles I and II of Pub. L. 93-637 (1975). *Id.* The two Titles served quite different purposes. The Federal Trade Commission Improvement Act, which amended the FTCA, expanded the FTC's powers by making unlawful unfair competition and unfair or deceptive acts or practices in *or affecting*

14

commerce. 15 U.S.C. §57(a). The addition was significant, for the phrase, "affecting commerce," indicates Congress' intent to regulate to the outer limits of its authority under the Commerce Clause. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001).

The Act did not define "consumer." By contrast, Magnuson-Moss, which dealt with warranties on household goods and which was not part of the FTCA, defined "consumer" as a "buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of [a]…warranty, and any other person who is entitled by the terms of such warranty… or under applicable State law to enforce against the warrantor…the obligations of the warranty. . . ." 15 U.S.C. §2301(3)(parenthesis in original). In turn, the term, "consumer product," was defined as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes. . . ." 15 U.S.C. §2301.

Restrictions on the FTC's authority stem not from a narrow definition of consumer, but from the definition of consumer product. Thus, businesses are not outside the protection of Magnuson-Moss so long as the purchased product is the type normally used for personal, family or household purposes. *See Waypoint Aviation Services, Inc. v. Sandel Avionics, Inc.*, 469 F.3d 1071, 1072 (7th Cir. 2006)(Easterbrook, C.J.); *Stoebner Motors v. Automobili Lamborghini S.P.A.*, 459 F.Supp.2d 1028, 1033-34 (D.Hawaii 2006); *Najran Co. for General Contracting and Trading v. Fleetwood Enterprises, Inc.*, 659 F.Supp. 1081, 1099 (S.D.Ga. 1986). *See* 16 C.F.R. §700.1(a) (2008). And it follows that the sophistication of the buyer is not a factor in determining the applicability of the Act. *See Karshan v. Mattituck Inlet Marina & Shipyard, Inc.*, 785 F.Supp. 363, 366 (E.D.N.Y. 1992).

Restricting the reach of Magnuson-Moss makes perfect sense in light of the perceived evil that the Act was designed to combat. As the House Report explained, beginning in the late 1950s, a rising

tide of complaints was received by members and committees of the Congress, the FTC and other agencies of government from irate owners of motor vehicles complaining about noncompliance with automobile warranties. By 1969, the task force on Appliance Warranties and Service issued its report on a study of over 200 warranties used by more than 50 appliance manufacturers. The report painted a dismal picture: consumers of household goods often misunderstood the scope of the warranties, and manufacturers and sellers often did not honor what warranties there were. *See* H.R. Rep. 93-1107 93d Cong., 2d Sess at 21 (June 13, 1974), *reprinted in* 1974 U.S.C.C.A.N. at 7702-04, 7707-10).

The Senate Conference Report made clear that the legislation was intended to supplement the ability of the Commission to redress consumer and other injury and was "not intended to modify or limit any existing power the Commission may have to itself issue orders designed to remedy violations of the law." S. Conference. Rep. No. 93-1408 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7774.

The FTCA was again amended in 1994.[4] While §5 continued to declare unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. §45(a)(1), §(n) was added, which limited the Commission's authority to declare unlawful an act or practice on unfairness grounds unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. 15 U.S.C.

---

[4] Between 1982 and 1994, there was a debate over the proper scope of the FTC's authority regarding unfair or deceptive practices. 140 Cong. Rec. H6164 (daily ed. Jul. 25, 1994) (statement of Rep. Dingell). Some members of Congress believed the FTC needed broader powers in order to address unfair practices, while others maintained that the FTC's power "should be severely restricted or eliminated." 140 Cong. Rec. H6164 (daily ed. Jul. 25, 1994) (statement of Rep. Dingell). While the FTC had been criticized by some in the 1970s for its "over-zealousness," (140 Cong. Rec. H6163 (daily ed. Jul. 25, 1994) (statement of Rep. Moorehead)), in the 1980s, the FTC was criticized for its "decreasing level of consumer protection." S. Rep. No. 103-130 (1993).

§45(n).[5]

Section 45(n) did not define "consumer." That the term was narrowly defined in Magnuson-Moss does not mean, as IFC contends, that Congress intended to import that definition into the FTCA, with its different and broader legislative goals. When Congress wants to limit consumer protection, it does so explicitly as it did in Magnuson-Moss and in the Electronic Signature in Global and National Commerce Act, 15 U.S.C. § 7006 (2005). There, Congress defined consumer as "an individual who obtains, through a transaction, products or services which are used primarily for personal, family, or household purposes...." It would not have been a difficult feat of draftsmanship for Congress in subsection (n) to have restricted the operation of the FTCA to those unfair practices that affect individuals purchasing household goods for personal use *Cf., Sperry & Hutchinson Co.,* 405 U.S. at 243-244. *See also Young v. Community Nutrition Institute,* 476 U.S. 974, 981 (1986)(had Congress intended a certain meaning, it certainly could have been "more precise or more prescient" than it was). The text and the legislative history of the 1994 Amendment to the FTCA demonstrate that Congress's intent was to limit the Commission's authority to proscribe *unfair* acts and practices *not* through a restrictive definition of "consumer," but rather through subsection (n)'s requirement that an unfair practice must cause substantial harm that is not reasonably avoidable or outweighed by countervailing benefits to consumers or competition.

Acceptance of IFC's argument would engraft into the text of §45(n) a limitation Congress

---

[5] The legislative history demonstrates that Congress's intent was to codify the FTC's Unfairness Policy Statement of 1980, which was contained in a letter in response to a request from the Consumer Subcommittee of the Committee on Commerce, Science and Transportation, requesting the Commission's views on cases under §5. *See* H.R. REP. 103-617, at 12 (1994), 1994 WL 385368 (Conf.Rep.) (Report, Conf.Comm. on H.R. 2243); S. REP. 103-130, at 11 (1993), 1993 WL 322671 (Report, Commerce Comm. on S. 1179); S. REP. 103-130, at 11 (1993), 1993 WL 322671.

chose not to include and would be incompatible with Congress' broad directive to the Commission to prevent unfair methods of competition and unfair or deceptive acts or practices, 15 U.S.C.A. § 45(a)(2) and would result in the creation of a "fixed and unyielding categor[y]," the very thing that Congress historically has abjured. *R.F. Keppel & Bro., Inc.*, 291 U.S. at 310. It would be odd to say the least for Congress in the Federal Trade Commission Improvements Act to have expanded the Commission's authority to the limits allowed by the Commerce Clause and then, *without comment*, some years later, to have so decisively circumscribed the effective reach of the Act by limiting the FTC's unfairness authority to individuals purchasing goods or services normally used for personal or household purchases. The effect of such a silent dilution of the FTC's authority would be to exclude from regulation literally millions of transactions that occur on a daily basis, regardless of how deceptive or unfair the acts or practices that prompted those transactions might be. When an odd or absurd result follows from a particular construction of a statute, that construction ought usually be rejected. *Public Citizen v. United States Dept. of Justice*, 491 U.S. 440, 455 (1989); *Matter of Lifschultz Fast Freight Corp.*, 63 F.3d 621, 625 (7th Cir. 1995).

## 2.

In the absence of contrary Congressional intent, it is assumed that statutory language carries its ordinary or common meaning. *Pioneer Investment Srvs. Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 388 (1993). *See also Engine Mfrs. Ass'n*, 541 U.S. at 252; *United States v. Alvarez-Sanchez*, 511 U.S. 350, 357 (1994); *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 987 (7th Cir. 2001).[6] One need not resort to Justice Frankfurter's oft-repeated dictum that "[t]he notion that

[6] The principle goes back to Blackstone : "Words are generally to be understood in their usual and most known signification…as their general and popular use." William Blackstone, *Commentaries on the* (continued...)

18

because the words of a statute are plain, its meaning is also plain, is merely pernicious oversimplification," *United States v. Monia,* 317 U.S. 424, 431 (1943) (dissenting opinion), to conclude that the common use and understanding of the term, "consumer," is not that proposed by IFC. IFC's definition is supported by Black's Law Dictionary, which defines "consumer" as: "A person who buys goods or services for personal, family, or household use, with no intention of resale; a natural person who uses products for personal rather than business purposes." Black's Law Dictionary (8th ed. 2004).

In contrast to what is an undeniably specialized dictionary, there is *Merriam-Webster Collegiate Dictionary's* definition of consumer: "one that consumes: as *a.*: one that utilizes economic goods." (Eleventh Ed. 2003). The *Oxford English Dictionary* defines consumer as: "He or that which consumes, wastes, squanders, or destroys. One who uses up an article produced, thereby exhausting its exchangeable value; One who purchases goods or pays for services; a customer, purchaser." (2nd ed. 1984). The *American Heritage Dictionary* defines consumer as: "One that consumes; especially one that acquires goods or services for direct use or ownership rather than for resale or use in production and manufacturing." (4th ed. 2000). What emerges from this sampling is a refutation of IFC's position that the commonly understood meaning of "consumer" is that found in Magnuson-Moss.

Moreover, where, as here, the same word appears in different statutes dealing with issues other than those sought to be remedied by the act under consideration, it is not unusual for the word to have different meanings. *See Indianapolis Life Ins. Co. v. United States*, 115 F.3d 430, 435 (7th Cir.

---

[6](...continued)
*Laws of England* 43 (1765)(Wayne Morrison ed., Cavendish Publishing Ltd. 2001).

1997); *In re Payne*, 431 F.3d 1055, 1058 (7th Cir. 2005). As Justice Holmes famously observed in *Towne v. Eisner*, 245 U.S. 418, 425 (1918): "A word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary in color and content according to the circumstances and the time in which it is used." *Indianapolis Life Ins. Co. v. United States*, 115 F.3d 430, 435 (7th Cir. 1997).[7] Even where the same term is used in different parts of the same act, linguistic symmetry is not mandatory. *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 202 (2001).

### 3.

The FTC argues that it has long taken the position that its statutory authority to proscribe unfair and deceptive practices is not limited to individuals buying household or personal goods. The FTC notes that its 1980 Unfairness Policy Statement, *supra* n.7, describes the consumer injury factor which included "businessmen" among those protected. Before that, in 1975, the FTC issued an order against Spiegel, a large, national mail order catalogue retailer, for unfair practices in connection with its suing for small customer indebtedness in a forum inconvenient to the customers. The Initial Decision adopted by the full Commission noted that those affected included "small companies." *Spiegel, Inc.*, 86 F.T.C. 425, 439, 1975 FTC Lexis 107, at *14-15 (1975).

In *Orkin Exterminating Co., Inc.*, 108 F.T.C. 263 (1986), *aff'd.*, *FTC v. Orkin*, 849 F.2d 1354 (11th Cir. 1988), the Commission relied on its unfairness authority to question Orkin's refusal to

---

[7] *Cf. Knights Templars' & Masons' Life Indemnity Co. v. Jarman* , 187 U.S. 197, 201(1902)("The same words may require a different construction when used in different documents, as, for instance, in a contract, and a statute; and identity of words is not decisive of identity of meaning where they are used in different connections and for different purposes. In a contract, the technical rights of the parties only are involved; in a statute, an important question of public policy."); *First Bank v. Faul*, 253 F.3d 982 (7th Cir. 2001); Walter W. Cook, *"Substance" and "Procedure" in the Conflict of Laws*, 42 Yale L.J. 333, 337 (1933) ("The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them, runs all through legal discussions. It has all the tenacity of original sin and must constantly be guarded against.").

honor its guaranteed lifetime rate to its customers. The Commission ordered relief for "customers," which included "businesses." 108 F.T.C. at 381, 1986 FTC LEXIS at 3 at *92. More recently, the FTC prosecuted *Cyberspace.com LLM*, 453 F.3d 1196, whose activities affected both individuals and small businesses. *See also FTC v. Datacom Marketing, Inc., No.* 06 C 2574, 2006 WL 1472644, at *2 (N.D. Ill. May 24, 2006)(Holderman, J.)(deceptive scheme involved sale of business directories to businesses and organizations).

The FTC also adverts to the Franchise Rule, which protects businesses and individuals alike. 616 C.F.R. §436, and, it cites to a number of cases that it says demonstrates its consistency in utilizing its unfairness authority to deal with activities that affect businesses (*FTC Response* at 13, n.14). The FTC's rejoinder is that between 1980 and 1994 the FTC has narrowly defined "consumer" in certain contexts. For example, in the Holder Rule, 16 C.F.R. § 433.1(b), consumer is defined as "a natural person who seeks or acquires goods or services for personal, family, or household use." *See also* 16 C.F.R. §§ 429.0(b) (defining "consumer goods or services"). The Credit Practices Rule also defines "consumer" in the way that it is defined in §433.1(b). *See* 16 C.F.R. § 444.1(d). This, IFC contends, shows the FTC's inconsistent approach to the definitional problem presented by this case and precludes giving the current approach any deference.

It cannot be too often recalled that the FTC is charged with giving meaning to "the elusive, but congressionally mandated standard of fairness," *Sperry & Hutchinson Co.*, 405 U.S. at 244, which by its very nature, is a "a flexible concept with evolving content." *FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 353 (1941). *Cf. Herring v. New York*, 422 U.S. 853, 866-867 (1975)("'fairness is a relative not an absolute concept'" dependent on circumstances). To implement "[a] statute expressive of such large public policy as that on which the [Federal Trade Commission] is based," *Phelps Dodge Co.*

*v. NLRB*, 313 U.S. 177, 194 (1941), Congress has given the FTC regulatory flexibility. Thus, rather than reflecting vacillation, the FTC's prior use of a restrictive definition reflects an exercise of that flexibility in response to perceived evils. In any event, "[t]he fact that the agency has from time to time changed its interpretation of [a] term...does not.... lead us to conclude that no deference should be accorded the agency's interpretation of the statute." *Chevron U.S.A., Inc.*, 467 U.S. at 863.

The *in terrorem* contention that application of the FTC's consumer unfairness jurisdiction to "transactions like the ones at bar will have a destructive impact on the U.S. marketplace," and has "the potential to bring U.S. commerce to a screeching halt," (*Reply* at 11), is unsupported and thus must be rejected. *IFC Credit Corp.*, 437 F.3d at 610-611; *United States ex rel. Feingold v. AdminiStar Federal, Inc.*, 324 F.3d 492, 494 (7th Cir. 2003). It is also unacceptable for a more basic reason. If the FTC were to prevail at trial, all that would be "chilled" would be unfair and deceptive practices–a result consistent with the principle that "'[t]he necessity of good faith and honest, fair dealing, is the very life and spirit of the commercial world.'" *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481-482 (1974). *Cf. FTC v. Algoma Lumber Co.*, 291 U.S. 67 (1934)(Cardozo, J.)("Fair competition is not attained by balancing a gain in money against a misrepresentation of the thing supplied. The courts must set their faces against a conception of business standards so corrupting in its tendency."); *FTC v. Standard Educ. Soc'y,* 86 F.2d 692, 696 (2d Cir.1936) (L. Hand, J.) (the FTC's "duty ... is to discover and make explicit those unexpressed standards of fair dealing which the conscience of the community may progressively develop"), *rev'd on other grounds,* 302 U.S. 112 (1937) (reversing that part of Second Circuit's holding which modified and weakened FTC's cease and desist order);

Beyond this, the "chilling" argument is little more than an expression of IFC's preference for a particular economic and social theory – namely that business entities are not in need of the FTC's

protection and can fend for themselves. Perhaps there is an argument to be made for this sort of commercial Darwinism. But it is for the Congress to make that judgment and to select from among the clashing theories the one it believes best serves the national interest. It has done so in any number of statutes, one of which is the FTCA. It is not the role of courts to gainsay those policy choices. *See Tennessee Valley Authority v. Hill*, 437 U.S. 153, 194-195 (1978); *United States v. Roberson*, 474 f.3d 432 (7th Cir. 2007)(Posner, J.); *Mississippi Poultry Ass'n, Inc. v. Madigan*, 31 F.3d 293, 310 (5th Cir. 1994); Frankfurter, *John Marshall and the Judicial Function*, in Government Under Law, 31 (1956).

Congress has entrusted to the FTC the power to determine whether a particular act or practice is unfair. Consistent with its Congressional mandate, the FTC has concluded that small businesses and religious and other not-for-profit organizations are consumers and are entitled to protection from deceptive and unfair acts and practices. That is the end of the matter so long as that judgment is reasonable. *Federal Express Corp. v. Holowecki*, 128 S.Ct. 1147 (2008); *Bob Evans Farms, Inc. v. NLRB*, 163 F.3d 1012, 1018 (7th Cir. 1998); *Batanic v. I.N.S.*, 12 F.3d 662, 665-666 (7th Cir. 1993).

## C.
## The Complaint

### 1.
### Count I

Count I alleges that under the circumstances of this case – which were known to IFC (*Complaint*, ¶¶ 9, 21, 23-24, 26, 27, 28, 31-33, 35-42, 49-50, 53) – IFC's statements in debt collection letters and elsewhere that consumers could be liable for fraud in the inducement and for intentionally deceiving IFC into paying NorVergence for the ERAs and that the lessee had no defenses to payment on the ERAs (¶¶ 48, 61), were deceptive. (*FTC's Response to Motion to Dismiss*, at 18-21). IFC argues that its statements were merely assertions of its legal position regarding the enforceability of

the ERAs and are thus not deceptive.

"The FTC may establish corporate liability under §5 with evidence that a corporation made material representations likely to mislead a reasonable consumer," *FTC v. Bay Area Bus. Council, Inc.,* 423 F.3d 627, 635 (7th Cir. 2005), made for the purpose of inducing consumers to purchase goods or services. *F.T.C. v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1029 (7th Cir. 1988). A misrepresentation is considered material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product." *Kraft, Inc. v. F.T.C.,* 970 F.2d 311, 322 (7th Cir. 1992). Intent to deceive is not an element, but a consumer's reasonable and detrimental reliance is. *Bay Area Bus. Council,* 423 F.3d at 635.

The FTC's claim is somewhat less than a perfect fit for §5's prohibition against deceptive practices, since such cases usually involve advertisements made by the defendant to induce consumers into purchasing the defendant's products or services. *See, e.g., Bay Area Bus. Council, Inc.,* 423 F.3d at 635 (defendants misled consumers with bad credit into believing they were buying credit cards when in fact they were buying worthless "ChexCards"); *World Travel Vacation Brokers,* 861 F.2d at 1029 (defendants misrepresented the cost of vacation packages to Hawaii). The FTC's own examples of what it considers deceptive practices are illustrative:

> Practices that have been found misleading or deceptive in specific cases include false oral or written representations, misleading price claims, sales of hazardous or systematically defective products or services without adequate disclosures, failure to disclose information regarding pyramid sales, use of bait and switch techniques, failure to perform promised services, and failure to meet warranty obligations.

FTC Policy Statement on Deception, at 3. This catalog of examples is not exclusive.

Courts interpreting Illinois' Consumer Fraud and Deceptive Business Practices Act have, as IFC points out, found that "[t]aking a position on the interpretation of legal documents, even if

erroneous, is not a deceptive trade practice or act." *Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003)(*quoting City of Aurora v. Green,* 126 Ill.App.3d 684, 81 Ill.Dec. 739, 467 N.E.2d 610, 613 (2nd Dist. 1984)); *Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 671 (7th Cir. 2001). But while the Illinois Act is a "little FTC Act" requiring that its construction be guided by FTC and judicial interpretations of the FTCA, 815 ILCS 505/2; *Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 148, 776 N.E.2d 151, 160 (2002), the converse is not true. And the cases upon which IFC relies did not look to the FTC or the federal courts to aid in their interpretation of the Illinois Act. Still, the principle articulated by these cases is of at least some interest here.

"'As a general rule, one is not entitled to rely upon a representation of law since both parties are presumed to be equally capable of knowing and interpreting the law.'" *Hoseman*, 322 F.3d at 476 (quoting *City of Aurora v. Green*). Furthermore, a claim as to a legal position could be likened to a statement of an opinion, as in, "in my opinion, the law is on my side in this dispute." According to the FTC's Policy Statement on Deception:

> [The FTC] generally will not bring advertising cases based on subjective claims (taste, feel, appearance, smell) or on correctly stated opinion claims *if consumers understand the source and limitations of the opinion.*" Claims phrased as opinions are actionable, however, *if they are not honestly held*, if they misrepresent the qualifications of the holder or the basis of his opinion *or if the recipient reasonably interprets them as implied statements of fact.*

*Id.* at 14 (Emphasis supplied).

The Policy Statement does not resolve this case. Nor does *F.T.C. v. Verity Intern., Ltd.*, 443 F.3d 48 (2nd Cir. 2006), *cert. denied*, 127 S.Ct. 1868 (2007). There, the defendant represented to telephone line subscribers that they were liable for, and demanded payment of, charges incurred on their telephone lines irrespective of whether the subscribers accessed or authorized others to access, pornographic websites. *Verity*, 335 F.Supp.2d at 484. The district court found this to be a deceptive

practice, and the Second Circuit affirmed, finding it not clearly erroneous for the district court to have found that the bills "conveyed a representation of uncontestability." *Verity*, 443 F.3d at 63. From this, the FTC argues that any representation of uncontestability is deceptive. This conclusion overlooks the oft-repeated admonition that "[o]ne must read cases, however, not in a vacuum, but in light of their facts...." *Penry v. Lynaugh*, 492 U.S. 302, 358 (1989)(Scalia, J., concurring and dissenting in part). *Accord Wisehart v. Davis*, 408 F.3d 321, 326 (7th Cir. 2005)(Posner, J.)("Judges expect their *pronunciamentos* to be read in context. . . .").

The facts in *Verity* differ in significant ways from those here. The district court in *Verity* found that the defendant caused charges for adult entertainment to appear on AT & T phone bills as telephone calls, thereby "capitaliz[ing] on the common and well-founded perception held by consumers that they must pay their telephone bills, irrespective of whether they made or authorized the calls." 443 F.3d at 64-65. The Court of Appeals noted that "'[i]t was clearly foreseeable that this [phone-bill] formatting [which listed information-service purchases as long-distance-telephone-call charges] would cause some customers to think that ... the charges had to be paid in order to maintain phone service.'" 443 F.3d at 64 (Brackets in original). "Because the defendants "offer[ed] no reason why this misrepresentation would not be likely to mislead consumers acting reasonably," the court found that the district court did not err in concluding that the FTC had proved reasonable reliance. *Id.* at 64.

The Court of Appeals also stressed the confusing and misleading nature of the phone bill formatting, concluding that the evidence presented at trial warranted the district court's conclusion that telephone-line subscribers in fact found the representations material to their decision whether to pay the billed charges because of the worry of telephone-line disconnection, the perception of the

futility of challenging the charges, the desire to avoid credit-score injury, or some combination of these factors. *Id.* at 63. No comparable combination of factors exists here.

At the time of IFC's claimed misrepresentations, there was not judicial unanimity on the enforceability of the ERAs. Thus, the flat statement that the lessee had no defense was at least arguably inaccurate, to the extent it would be understood as a statement of fact and not of opinion or of IFC's legal position. While it seems unlikely that the recipients of a dunning letter from IFC would likely be influenced by it, as the complaint says they were, or reasonably could have relied on it seems doubtful. *Cf. Mayer v. Spaniel Intern. Ltd.*, 51 F.3d 670, 676 (7th Cir. 1995)("reliance on a known adversary's legal advice is not reasonable, especially when one has ready access to a lawyer of one's own."). However, "on a motion to dismiss the complaint a court must indulge every factual assumption in the plaintiff's favor." *Waypoint Aviation Services, Inc.*, 469 F.3d at 1072.

The complaint also charges that NorVergence told consumers that "payment on the Rental Agreements would ensure all the savings promised by NorVergence on telecommunications services" and that "IFC repeated that promise to its customers." (*Complaint* ¶9). The complaint does not say when these promises were made or under what circumstances. And so it is impossible to know whether these statements might have been made in conjunction with the allegedly deceptive statements thereby becoming a factor in the reasonableness analysis. *Compare Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1550 (7th Cir.1990)( "In Illinois a liar may not lull the victim into a false sense of security and then say that the reliance was not justifiable."). *Verity* did not conclude that the representations were deceptive until after a trial. That is the appropriate course here.

There are also sufficient allegations from which it may be inferred that IFC did not believe

that the ERAs were true equipment rental leases and that it should have been apparent that the predominant purpose of the transactions between the consumers and NorVergence was the financing of telecommunications services, not the rental of the MATRIX box.[8]  Consistent with these allegations are the allegations that charge deviations from IFC's usual and customary practices in connection with the ERAs. (¶¶ 27, 31, 33, 35-41, 49-50, 53).[9]

For IFC, the beginning and end of the matter is the ERA, itself, which states that it is a lease of equipment, that the consumers agreed that it was a finance lease, and that they were unconditionally obligated to make payments to any assignee. (Reply Brief at 12-14, 17).  In some contexts, the argument would be unanswerable. But not here in light of the allegations in the complaint discussed above.  Finally, even prior to accepting assignment of an ERA, IFC made statements to consumers consistent with NorVergence's representations of telecommunications cost savings that were guaranteed for five years, thereby reinforcing the impression that payments on the ERAs were for telecommunications services. (*Complaint*, ¶33).

What Justice Story said in *Welch v. Mandeville*, 14 U.S. 233, 236 (1816) fairly expresses the FTC's underlying theory about the ERAs: "It would be strange, indeed, if parties could be allowed, under the protection of its forms, to defeat the whole objects and purpose of the law itself." *Cf., Tomic v. The Catholic Dioceses of Peoria*, 442 F.3d 1036, 1039 (7th Cir. 2006)( Posner, J.)(a church can't designate all of its employees ministers; if they did, "the court would treat the designation as a

---

[8] In coming to this conclusion I have, as the FTC has requested, not considered ¶47 of the complaint insofar as it refers to a May 2004 observation by IFC's general counsel. (*FTC Response* at 1, n.1).

[9] The Michigan Court of Appeals in *Custom Data Solutions, Inc. v. Preferred Capital, Inc.*, 274 Mich.App. 239, 733 N.W.2d 102 (2007) concluded that the ERAs were not true finance leases. *Accord Specialty Optical v. IFC Credit Corp.*, No. CC - 04-09187-C (Tex. Dallas County Court at Law No. 3), discussed in FTC response at 15, n. 16. Indeed, in that case the court after a full trial concluded that IFC had participated in NorVergence's fraud.

28

subterfuge....").[10] Echoes and application of this basic principle appear in a number of cases in which the Seventh Circuit has dealt with the question of whether a particular transaction, although expressly denominated as a "lease" with an option to purchase, is, in reality, something different.

These cases have made clear that the label chosen to describe a transaction is not determinative and that calling something a lease does not necessarily make it a lease. *See e.g., R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 924 F.2d 709 (7th Cir. 1991); *Orix Credit Alliance v. Pappas*, 946 F.2d 1258 (7thCir.1991). *Cf. King v. Federal Bureau of Prisons*, 415 F.3d 634, 636-637 (7th Cir. 2005)(Posner, J.)(calling something a business doesn't make it a business). These cases are illustrative of the more encompassing principle that substance is not to be subordinated to semantics and labels. *Cf. DiSanto v. Pennsylvania*, 273 U.S. 34, 43 (1927)("the logic of words should yield to the logic of realities."); *United States v. R.F. Ball Const. Co.*, 355 U.S. 587, 593 (1958)("Substance, not form or labels, controls the nature and effect of legal instruments.")(Whittaker, J., dissenting); *W.B. Worthen Co. ex. rel. Board of Commissioners v. Kavanaugh*, 295 U.S. 56, 62 (1935)("What controls our judgment. . . is the underlying reality rather than the form or label.")(Cardozo, J.); *Walsh v. Heilmann*, 472 F.3d 504 (7th Cir. 2006)("But why should anything turn on the label?").

Judge Easterbrook in *TKO Equipment Co. v. C & G Coal Co.*, 863 F.2d 541, 543 (7th Cir. 1988) has explained why parties often go to great lengths to make a transaction appear to be a lease when it is not. The answer, he says, lies in bankruptcy law. The automatic stay in 11 U.S.C. §362

---

[10] The Iowa Court of Appeals in a one-page opinion in *Liberty Bank, F.S.B. v. Diamond Paint and Supply, Inc.*, 2006 WL 2691719 (2006), concluded that *under Iowa law*, a NorVergence ERA was a finance lease and that the bank was entitled to continued rental payments. The court rejected the argument that the close connection between NorVergence and the bank made the contracts unenforceable since Iowa has not adopted the "close connection doctrine." (*Reply* at 19). The defendant's claims of fraud and unconscionability were waived since they had not been presented to the trial court. This case differs dramatically from *Liberty Bank* since it is an unfairness case under the FTCA and the theory and the arguments advanced by the FTC were not comparable to those before the court in *Liberty Bank*.

disables secured parties from repossessing what they have sold. What is leased, however, is returnable. So sellers doubting their buyers' financial stability often seek to cast their transactions as leases with options to buy, thereby eroding the security of other creditors. So too here. According to the complaint, NorVergence attempted to artificially structure what was in reality an integrated transaction for telecommunications services and equipment into a separate lease agreement. The purpose was to make the ERAs attractive to factors, who could then argue that a cessation of telecommunication services had no effect on their right to continue collecting "rental" payments.

The complaint charges that IFC should have known the truth and that the consumers reasonably relied to their detriment on the representations of uncontestability. It remains to be seen what the proof will be. But the FTC has stated enough to withstand the motion to dismiss Count I.

## 2.
## Count II

"Stated most simply," it is the theory of Count II that for "IFC to continue to purchase the Rental Agreements under these circumstances and then collect on them when they are worthless is unfair." (*Response* at 25). The FTC has no authority to declare an act or practice unlawful on unfairness grounds unless: (1) it causes or is likely to cause substantial injury to consumers, (2) the injury is not reasonably avoidable by consumers themselves, and (3) the injury is not outweighed by countervailing benefits to consumers or to competition. 15 U.S.C. § 45(n). A substantial injury is not one that is merely trivial or speculative, and the FTC has made clear that it has no concerns with *de minimus* injuries. *American Financial Services Ass'n v. F.T.C.*, 767 F.2d at 972, 975. But even a small harm may qualify if it affects a large number of people. *F.T.C. v. J.K. Publications, Inc.*, 99 F.Supp.2d 1176, 1201 (C.D.Cal. 2000). Here the injuries were substantial, both in monetary terms and in numbers of consumers affected. The total payments under an ERA over its five-year term

ranged from \$4,439 to \$160,672, depending on the lease – even though the cost of a box never exceeded \$1,300 and in a number of cases was less than \$300. (*Complaint*, ¶10).

The more significant issue is whether the injury was "reasonably avoidable by the consumers themselves." In making that determination, some courts have looked to "whether consumers had a free and informed choice that would have enabled them to avoid the unfair practice." *American Financial Services*, 767 F.2d at 976; *J.K. Publications*, 99 F.Supp.2d at 1201. Others have said that "[c]onsumers may act to avoid injury before it occurs if they have reason to anticipate the impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they are aware of potential avenues toward that end." *Orkin Exterminating Co., Inc. v. F.T.C.*, 849 F.2d at 1365; *J.K. Publications*, 99 F.Supp.2d at 1201.

The principle of reasonable avoidance, now codified in § 45(n), traces its lineage to the FTC's 1980 Unfairness Policy Statement. In response to a request from the Consumer Subcommittee of the Committee on Commerce, Science and Transportation, requesting the Commission's views on cases under §5, the Commission explained:

> Normally we expect the marketplace to be self-correcting, and we rely on consumer choice – the ability of individual consumers to make their own private purchasing decisions without regulatory intervention – to govern the market. We anticipate that consumers will survey the available alternatives, choose those that are most desirable and avoid those that are inadequate or unsatisfactory. However, it has long been recognized that certain types of sales techniques may prevent consumers from effectively making their own decisions, and that corrective action may then become necessary. Most of the Commission's unfairness matters are brought under these circumstances. They are brought, not to second-guess the wisdom of particular consumer decisions, but rather to halt some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking.
>
> Sellers may adopt a number of practices that unjustifiably hinder such free market decisions. Some may withhold or fail to generate critical price or performance data, for example, leaving buyers with insufficient information for informed comparisons.

31

Some may engage in overt coercion, as by dismantling a home appliance for 'inspection' and refusing to reassemble it until a service contract is signed. And some may exercise undue influence over highly susceptible classes of purchasers as by promoting fraudulent 'cures' to seriously ill cancer patients. Each of these practices undermines an essential precondition to a free and informed consumer transaction, and, in turn, to a well functioning market. Each of them is therefore properly banned as an unfair practice under the FTC Act.

(H.R.Rep. No. 156, Pt. 1, 98th Cong., 1st Sess. 37 (1983); Trade Reg.Rep. (CCH) ¶ 50,421 at 55,948) (Footnotes omitted).

The ERA stated that the obligation to pay rental on the MATRIX box was unconditional and that the consumer would have no defenses against an assignee. There were no extrinsic pressures compelling the consumers to sign on with NorVergence. "Lots of firms participate in the telecom-equipment business, and all a customer need[ed] do [was] say no to [NorVergence's] offer and let the competition continue." *IFC Credit Corp.*, 512 F.3d at 992-993. *Accord IFC Credit Corp. v. Rieker Shoe Corp.*, 378 Ill.App.3d 77, 881 N.E.2d 382 (1st Dist. 2007).[11]

Long-standing principles of contract and sound public policy impose a duty on contracting parties to understand the obligations they are assuming, and if they do not, they cannot be heard to later complain about a lack of understanding. *Treiber & Straub, Inc. v. U.P.S., Inc.*, 474 F.3d 379, 385 (7th Cir. 2007); *Paper Exp., Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992); *Shaw v. Autozone*, 180 F.3d 806, 811 (7th Cir. 1999); *Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1207 (7th Cir. 1998). Nor can a party claim justifiable reliance on representations contrary to those in a written contract so long as there was a full opportunity to read

___

[11] The complaint indicates that the consumers already had telecommunications services, but were hoping to find a cheaper deal, and thus were not going to be left without any service if they refused to sign the ERA. So the ERAs were not the prototypical "take-it-or-leave-it" deals thought of as contracts of adhesion. But even in those cases the adhesion argument is toothless. *IFC Credit Corp. v. United Business & Indus. Federal Credit Union*, 512 F.3d 989, 992-993 (7th Cir. 2008); *Dugan v. R.J. Corman R. Co.*, 344 F.3d 662, 668 (7th Cir. 2003); *Koveleskie v. SBC Capital Markets, Inc.*, 167 F.3d 361, 367 (7th Cir. 1999).

it. *Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003); *Carr v. CIGNA Securities, Inc.*, 95 F.3d 544, 547 (7th Cir. 1996).[12]

The complaint charges that the lessees were presented with a "large set" of documents – a "pile" in which the ERA was "simply included." (*Complaint*, ¶¶16-17). The response brief calls them a "flurry of documents." (*Id.* at 2-3).[13] The ERA was a single, double-sided page, with the relevant clauses in bold faced type. The several accompanying documents were single-paged and uncomplicated. In total, there were perhaps 10 pieces of paper.[14] Some were specifically non-binding – a form reserving equipment, for example – or simple applications for service or credit. One was a seven-line, oversized-type "guarantee certificate." One or two others were line-item quotes purporting to reflect the savings that would be enjoyed over the prospective lessees' current service. This does not appear to be an unmanageable amount of information, and in any event, there is no "I didn't read it" defense, *Dugan v. R.J. Corman R. Co.*, 344 F.3d 662, 667 (7th Cir. 2003), unless there was some obstacle to the "lessees" being able to review the materials.

---

[12] In *Carr*, the court said, "[i]f a literate, competent adult is given a document that in readable and comprehensible prose says X. . . and the person who hands it to him tells him, orally, not X... our literate competent adult cannot maintain an action for fraud against the issuer of the document." 95 F.3d at 547. The provisions of the ERA that made reference to Uniform Commercial Code Article 2A and to a finance lease is perhaps not the kind of readable and comprehensive prose that *Carr* had in mind. *See Complaint*, ¶¶35-36. However, consumers "had an opportunity to submit the document to counsel; [they] cannot use [their] own decision to bypass legal advice as a reason why [they are] not bound by what [they] signed." *IFC Credit Corp.*, 512 F.3d at 992.

[13] The FTC did not attach the ERA or any of the other transaction documents to the complaint, but provided them in connection with its motion for a preliminary injunction. As it refers to the documents in its complaint and in its motion to dismiss and relies on them to make out its claims, they can be regarded as part of the pleadings. *Minch v. City of Chicago*, 486 F.3d 294, 300 n.3 (7th Cir, 2007); *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir.1998).

[14] Often, the argument is made that the document is too lengthy and it would be unreasonable to expect a person to pour through it looking for "nuggets of intelligible warnings." *Carr*, 95 F.3d at 547(427 page document). Where something is apparent in an 8-page document, the question of reliance takes on a different complexion. *Rissman v. Rissman*, 213 F.3d 381, 388-389 (7th Cir. 2007)(Rovner, J., concurring).

The FTC argues that the consumers were told by NorVergence salespeople that they would realize significant savings over the term of the lease and that they were entitled to rely on that representation. (*FTC's Response*, at 26). They no doubt were. But reliance on that representation does not mean that the consumers were relieved of the obligation to read the contracts to learn what they were agreeing to. *F.T.C. v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988) and *F.T.C. v. World Media Brokers Inc.*, 2004 WL 43247, at *6 -7 (N.D.Ill. Mar. 2, 2004), on which the FTC relies, involved claims of *deceptive* practices, which are analyzed under a different standard. Section 45(n) does not apply, and the focus is on the deceptive act, not on whether the injury could reasonably have been avoided notwithstanding the deception. *World Travel Vacation Brokers, Inc.*, 861 F.2d at 1029; *World Media Brokers, Inc.*, 2004 WL 432476, at *6-7. Beyond that, *World Media Brokers* was a telemarketing case, and *World Travel Vacation Brokers* was an advertising case. In neither instance did the consumers have contracts to read to see for themselves what they were getting into.

While relevant, the contract principles discussed earlier, are not conclusive, for this is not an action at common law for simple breach of contract or for fraud. Rather it is an action under a federal statute that makes unlawful conduct causing substantial, unavoidable injury that is without countervailing benefits. That is, it is an action that charges "unfairness," and legality and unfairness are not necessarily congruent. *See F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972); *FTC v. Spiegel, Inc.*, 540 F.2d 287 (7th Cir. 1976).

The theory of the complaint is that NorVergence engaged in a "massive fraudulent scheme" directed against small businesses and religious and other non-profit organizations. (*Complaint*, ¶8). The means by which the scheme was accomplished were through representations made by

NorVergence salespeople which conveyed and furthered the impression that what was being contracted for was an integrated package for telecommunications services, not a long-term finance lease of a MATRIX box that was valueless without those services. To further the scheme, the transaction documents were structured in such a way that an assignee of the ERA could later argue that the ERA was a standalone equipment lease, rather than a component of that integrated package of telecommunications services. IFC, allegedly aware of all this, (*Complaint*, ¶¶26-28, 31-45), itself made promises and representations to the consumers that furthered this perception (*Complaint*, ¶¶9, 33) and handled the ERAs it purchased from NorVergence in a significantly different manner than it did with its other "equipment leases."

Of course, the victims of NorVergence's fraud and of IFC's claimed lulling efforts, were not obligated to assume that either was "a liar," *Consolidated Bearings Co. v. Ehret-Krohn Corp.*, 913 F.2d 1224, 1230 (7th Cir. 1990), and they could not have known (or learned) of NorVergence's precarious financial situation or the massive fraud being perpetrated on consumers throughout the country.[15] While the consumers knew that their monthly payment was being allocated in prescribed percentages, that fact would have been meaningless s to a reasonable consumer and would not have alerted the consumer of what was to come. While the ERA said that the obligation to make monthly payments was unconditional, the consumers could not have reasonably anticipated that, to use Justice Cardozo's phrase, "the doom of mere sterility was on the [transaction] from the beginning." *Clark v. United States*, 289 U.S. at 11 (1933), and that it was a virtual certainty, not merely a possibility

---

[15] Even in garden variety fraud suits, there is no reasonable investigation requirement. *Mayer*, 51 F.3d 670 (7th Cir. 1995). As Judge Easterbrook said, in *Mayer*, "[t]olerating fraud by excusing deceit when the victim is too easily gulled increases both the volume of fraud and expenditures on self-defense. Society is better off with less fraud and fewer precautions against it, and the common law has tailored the doctrine accordingly."

inherent in any comparable transaction, that its contracted for telecommunications services would cease and they would be on the hook to an assignee. Having no reason to anticipate the harm that was certain to befall them, there was no occasion for the consumers even to consider taking steps to avoid it. *See Orkin Exterminating Co., Inc.* 849 F.2d at 1365; *J.K. Publications*, 99 F.Supp.2d at 1201. [16] In short, the harm was not reasonably avoidable.

## 3.
## Count III

The contract principles discussed in Count II are outcome-determinative with reference to Count III. It charges IFC with "unfair use of distant forums" by suing consumers in Illinois even though they lived hundreds or thousands of miles away pursuant to the forum selection clause in the ERAs. The clause, which was in bold-faced type, said:

> This agreement shall be governed by, construed and enforced in accordance with the laws of the State in which [NorVergence's] principal offices are located or, if this lease is assigned by [NorVergence], the State in which the assignee's principal offices are located, without regard to such State's choice of law considerations and all legal actions relating to this Lease shall be venued exclusively in a State or Federal court located in that State, such court to be chosen at [NorVergence] or NorVergence's] assignee's sole option. You hereby waive right to trial by jury in any lawsuit in any way relating to this rental.

(ERA, at 2; *Complaint*, ¶ 57).

IFC has filed some 500 suits against consumers in "forums distant from the consumer's business location and that of the personal guarantors." (*Complaint*, ¶ 55). This practice has resulted in consumers having to go to significant expense to defend and, it is alleged, has facilitated IFC's obtaining default judgments against many of them. (*Complaint*, ¶¶55-56). This, the FTC says, is

---

[16] Anticipatory avoidance through consumer choice was not reasonably possible in Orkin because the contracts give no indication that the company would raise the renewal fees as a result of inflation, or for any other reason.

unfair under 15 U.S.C. § 45(a), because it "causes or is likely to cause substantial injury that is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or competition." (*Complaint*, ¶ 66).

Form agreements are common and enforceable, *IFC Credit Corp.*, 512 F.3d at 993, and the forum selection clause in the ERAs are valid under federal and Illinois law. *See IFC Credit Corp. v. Aliano Bros. General Contractors, Inc.*, 437 F.3d 606, 611 (7th Cir. 2006)(Posner, J.). *Aliano Bros.* held that the forum selection clause was "not confusing; it makes clear that the venue of any suit on the lease is the principal offices (i.e., the headquarters) of either [NorVergence] or, if the lease has been assigned, of the assignee." *Id.* at 611 (parenthesis in original). It was up to the consumers to have read the clause, because, as Judge Posner put it, "it is not fraud to fail to tell a person orally what is in the written contract he is being asked to sign." *Id.* "Anyone reading the contract would know both things [i.e., that the contract was assignable and contained the forum selection clause]...." *Id.* The Illinois Appellate Court has also validated the clause. *IFC Credit Corp. v. Rieker Shoe Corp.*, 378 Ill.App.3d 77, 881 N.E.2d 382 (1st Dist. 2007), stressing that it was up to the renter to read the contract before signing it. The several hundred parties that signed the ERAs "had an opportunity to submit the document to counsel; [they] cannot use [their] own decision to bypass legal advice as a reason why [they are] not bound by what [they] signed." *IFC Credit Corp.*, 512 F.3d at 992.

Parties are free to sign legal documents without reading them, but may not claim an immunity from suit based upon their avoidance of learning of risks otherwise apparent on the face of the document. *West v. Lincoln Beneficial Life Co.*, 509 F.3d 160 (3rd Cir. 2007); *Treiber & Straub, Inc. v. U.P.S., Inc.*, 474 F.4d 379 (7th Cir. 2007). Any other approach would make the certainty and predictability that written contracts are intended to insure, *In re Comdisco*, 434 F.3d 963 (7th Cir.

2006)(Posner, J.), largely unattainable. It would, moreover, encourage people either to close their eyes (hoping that they can reap the benefits without incurring the costs and risks of the venture) or to come up with hard-to-refute tales of not reading or understanding the documents they sign. *Novitsky v. American Consulting Engineers, L.L.C.*,196 F.3d 699, 702 (7th Cir. 1999).

Validity and fairness, however, are not coterminous. In *Sperry & Hutchinson Co.*, the Supreme Court held that the FTC had the authority to prohibit conduct that, although legally proper, was unfair to the public. The Court said that "the Federal Trade Commission does not arrogate excessive power to itself if, in measuring a practice against the elusive, but congressionally mandated standard of fairness; it, like a court of equity, considers public values beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws." 405 U.S. at 244. Relying on *Sperry & Hutchinson Co.*, the Seventh Circuit held in *Spiegel, Inc.* that the FTC had the power to prevent Spiegel from suing customers for delinquent credit accounts – invariably for small amounts – in a forum far from the consumer's residence.

The FTC had determined that Spiegel's policy of using state long-arm statutes against distant mail order customers was offensive "to clearly articulated public policy, intended to guarantee all citizens a meaningful opportunity to defend themselves in court." 540 F.2d at 293. The court concluded that it was reasonable for the Commission to conclude that given the small amounts owed, which paled in comparison to the costs of retaining counsel and traveling to the distant forum, consumers could not defend themselves. *Id.* at 294. At the time *Spiegel* was decided, a practice was considered unfair when it "offend[ed] established public policy and when the practice [was] immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Id.* at 293.

*Spiegel* is distinguishable from this case. First, the practice in *Spiegel* was sought to be

justified by arguing that it was permitted by the Illinois long arm statute, while here there is a forum

selection clause in a voluntarily executed contract. Second, the amounts owed under the ERAs were

anything but small and thus there is not the disincentive to defend that *Spiegel* found troubling.

Rather, as Spiegel attempted unsuccessfully to argue on appeal, the instant case *does* "involve

transactions valued in 'thousands of dollars....'" *Id.* at 294. Indeed, the complaint itself charges that

the total rental payments for the MATRIX 850 range from $4,439 to $160,672 and from $7,217 to

$34,631 for the SOHO. (*Complaint,* ¶ 20).

Finally, and most importantly, the unfairness test has changed since *Spiegel* was decided in

1976. Since 1994, the FTC cannot declare a practice unfair unless, *inter alia*, the injury could not

have been reasonably avoided by the consumers, themselves. 15 U.S.C. § 45(n).[17] The allegations

of the complaint demonstrate that as to the forum selection clause there was nothing interfering with

the capacity of the small businesses and religious and other not-for-profit organizations in this case

from making an informed choice. They were not members of some "highly susceptible class," 1980

FTC Policy Statement on Unfairness; *In the Matter of Ideal To Corporation*, 64 F.T.C. 297

(1964)(children); *In the Matter of Travel King, Inc.*, 86 F.T.C. 715 (1975)(the seriously ill), and they

were under no economic pressure to sign on with NorVergence. They already had telecommunications

---

[17] At the time of *Spiegel*, there was considerable controversy over the FTC's exercise of its consumer unfairness regulatory authority. *American Financial Services Ass'n*, 767 F.2d at 969. The FTC had vigorously stepped up its consumer protection activities under its unfairness regulatory authority. *Id.* This engendered commentators' criticism of the vagueness and breadth of the unfairness doctrine and, in response, Congress enacted the Federal Trade Commission Improvements Act of 1980, which suspended the Commission's rulemaking on children's advertising, and held oversight hearings on the question of whether the FTC's unfairness authority should be eliminated or permanently restricted. *American Financial Services*, 767 F.2d at 970. The FTC's 1980 Policy Statement on Unfairness to Congress defined an unfair practice essentially as it is now set forth in §45(n). *See* Senate Report No. 103-130 S. REP. 103-130, at *12 -13 (1993). *See also* Hillary Greene, *Guideline Institutionalization: The Role Of Merger Guidelines In Antitrust Discourse*, 48 Wm. & Mary L. Rev. 771, 849 (2006); David L. Belt, *The Standard For Determining "Unfair Acts or Practices" Under State Unfair Trade Practices Acts*, 80 Conn. B.J. 247, 265 (2006).

services, and there were competitors aplenty to which they could have turned. "A hard bargain with a hard-pressed man is one thing; we do not allow a workman to barter away his protection from injury." *Provident Life & Trust Co. v. Fletcher*, 237 F.104, 110-111 (S.D.N.Y. 1916)(L. Hand, J.), *aff'd* 258 F. 583 (2nd Cir. 1919). But that is not the case made out by the complaint.

It is not a sufficient answer to say that the ERA was included with the other documents or that the consumers thought the predominant purpose of the transaction with NorVergence was the purchase of a long-term package of telecommunications services. (*Complaint*, at ¶¶31, 33, 37). There is no allegation they did not know that the ERAs contained the forum selection clause or that there was fraud directed to that particular clause, which the Supreme Court said is necessary to invalidate the clause. *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 n. 14 (1974).

In *IFC Credit Corp.*, the court said: "...whatever the best rule would be when a party says that it did not know the document it signed was a contract, that's not the [defendant's] position. It concedes knowledge that it was making a contractual commitment and argues only that it thought the contract one for communications services, as opposed to a combination of service and equipment. This means that the [defendant] knowingly assented to a contract containing a clause agreeing to a bench trial." 512 F.3d at 995. Substitute the phrase, "containing a forum selection clause," for the phrase, "containing a clause agreeing to a bench trial," and resolution of the question raised by the motion to dismiss Count III follows inexorably.

In sum, there was nothing that prevented the consumers, acting reasonably, from anticipating the possibility of a suit. While they could not have anticipated the fraud and the *inevitable* cessation of telecommunications services – and this is what distinguishes Count II from Count III – they could have reasonably anticipated that there might be some problem with service that could lead to a suit

either by NorVergence or by the consumer itself. That risk was, as *Aliano Bros.* held, clear from the ERA, 437 F.3d at 611, and could have been reasonably avoided merely by not signing on with NorVergence and either maintaining the extant service or finding another provider. Consequently, Count III must be dismissed for failure to state a claim on which relief can be granted.

Cases in which courts have found unavoidable injury are not remotely comparable to Count III. *See e.g., Verity Intern., Ltd.*, 335 F.Supp.2d at 499 (injury not reasonably avoidable where consumer had to first suffer an injury before implementing protective measures such as international-call block, computer lock, or downloading software to prevent access to adult websites that were not always effective); *F.T.C. v. Windward Marketing, Inc.*, 1997 WL 33642380, at *13 (N.D.Ga.1997) (unauthorized bank draft on consumers' accounts); *F.T.C. v. Capital Choice Consumer Credit, Inc.*, 2004 WL 5149998, at *37 (S.D.Fla. 2004)(authorization was gained to bank account "using a recording played at such a speed so as to be nearly unintelligible"); *F.T.C. v. Crescent Pub. Group, Inc.*, 129 F.Supp.2d 311, 322 (S.D.N.Y. 2001)(charge for use of website where end of "free tour" was inconspicuous and billing methods were inscrutable); *F.T.C. v. Accusearch, Inc.*, 2007 WL 4356786, at *8 (D.Wyo. 2007)(consumers' phone records were sold despite their considerable efforts to maintain their privacy); *F.T.C. v. Seismic Entertainment Productions, Inc.*, 2004 WL 2403124, at *3 (D.N.H. 2004)(software code giving defendants access to computer was installed without consumer's knowledge); *In The Matter of International Harvester Company*, 104 FTC at 1070(1984)(concealed dangers in equipment); *F.T.C. v. Zuccarini*, 2002 WL 1378421 (E.D.Pa. 2002)(consumers could not reasonably avoid the injury caused by the defendant's practice of redirecting consumers to his website in combination with his practice of obstructing them from exiting the website).

## D.
## IFC's Constitutional Arguments

IFC has also moved to dismiss both Counts I and II on the grounds that the complaint

infringes its constitutional right of due process, to petition the courts, and to free speech under the

Fifth and First Amendments. To which the FTC responds:

> It is important to remember that the FTC's claims against IFC do not rest entirely or
> even principally upon IFC's use of the courts. IFC acquired and sought to enforce
> purported rental agreements that IFC knew or should have known were really to
> finance services. It then proceeded to leave no stone unturned in its mission of
> recovering payments from consumers. It lied to them about their rights and turned
> events on their head by threatening to sue the consumers for fraud and
> misrepresentation. And when all else failed, it filed collection actions against them,
> doing so in a forum tremendously inconvenient to most of them. IFC's use of the
> courts has been deceptive, groundless, and part and parcel of a course of conduct that
> violates the FTC Act. The Constitution affords that conduct no protection.

(*FTC Response* at 32).

The problem with IFC's argument is that nothing has happened to IFC yet – the FTC has

merely filed a complaint. There has been no restraint on IFC's freedom of speech. There is merely

a dispute about whether IFC's attempt to collect rental payments is permissible under §5 of the

FTCA. *Compare Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*, 447

U.S. 557, 559 (1980)(challenge to the FTC's ban on all advertising promoting the use of electricity);

*Beneficial Corp. v. F.T.C.*, 542 F.2d 611, 618 (3rd Cir. 1976)(challenging FTC's total ban on the use

of certain phrase in advertising tax preparation).

Nor has IFC been denied access to the courts as in *Tennessee v. Lane*, 541 U.S. 509, 513

(2004)(paraplegics denied access to state court system by reason of their disabilities) and *Boddie v.*

*Connecticut*, 401 U.S. 371, 380 (1971)(indigents denied access to court for purpose of obtaining

divorces due to inability to pay fees). In fact, IFC is presently in court aggressively fending off the

FTC and in courts in other forums litigating its claimed right to collect on the ERAs. Nothing has been decided, and no order has been implemented. This is the antithesis of a deprivation of due process. *Snyder v. Nolen*, 380 F.3d 279, 292 (7th Cir. 2004)(Easterbrook, J., concurring)("A forum that offers an opportunity to be heard before a decision becomes final provides due process of law."). Indeed, even IFC concedes that resolution of this argument must await the consideration of evidence that will be presented at the trial. (*Reply Brief* at 37-38).

For the foregoing reasons, IFC's motion to dismiss the FTC's complaint [#28] is DENIED as to Counts I and II and GRANTED as to Count III.

**DATE 4/9/08**          **ENTERED:**

_____
UNITED STATES MAGISTRATE JUDGE